Argued July 6, reversed September 7, rehearing denied November 3, 1926.

# J. A. GRAEF *v.* WARDE BOWLES ET AL.

### (248 Pac. 1090.)

**Evidence—In Contractor's Action to Recover Pay for Overtime Work in Painting Vessels, It was Erroneous to Admit Testimony Relating to Conversation Prior to Execution of Contract (§ 713, Or. L.).**

1. In action by contractor to recover additional costs incurred for overtime work performed in painting vessels, it was erroneous, under Section 713, Or. L., to admit testimony relating to conversation prior to execution of contract, since all previous negotiations become embodied in written agreement.

**Contracts—Employer's Superintendent's O. K. on Overtime Bill Could not be Construed as Contract, Since It Merely Informed Employer Work Recited Therein had Been Done.**

2. In action by contractor to recover additional costs for overtime work in painting vessels, where defendant's superintendent promised to O. K. overtime bills, *held*, his promise could not be construed as contract, but merely agreement that he would inform his employer that work recited had been done.

**Principal and Agent.**

3. One who deals with another as agent of third party does so at his peril.

**Principal and Agent.**

4. As to third persons, principal is bound by acts of his agent in scope of his apparent authority arising from manner in which principal has held him out to public.

**Contracts.**

5. Consideration in contract to perform work was not available as consideration to support secondary contract to pay for overtime work.

**Principal and Agent—In Action to Recover Additional Costs for Overtime Work Performed in Painting Vessel, Held, That Single Instance Where Defendants' Superintendent Ordered Painting of Certain Bedsteads was No Ground for Inferring Implied Authority to Make Contract for Overtime.**

6. In action by contractor to recover additional costs for overtime work performed in painting vessels, where during progress of work defendants' superintendent ordered painting of certain bed-

1. See 10 R. C. L. 1021.
3. See 21 R. C. L. 908.
4. See 21 R. C. L. 854.

steads, *held*, that such single instance of directing contractor was not ground for inferring implied authority to make contract for overtime work.

**Principal and Agent—Before Defendants Could Ratify Action of Their Superintendent, They must have had Knowledge Thereof.**

7. In action by contractor to recover additional cost incurred for overtime work performed in painting vessels, where defendants' superintendent promised to O. K. plaintiff's overtime bill, *held* that, before defendants could ratify action of their superintendent with plaintiff, they must have had knowledge of such conversation.

Agency, 2 C. J., p. 476, n. 18, p. 562, n. 81.
Contracts, 12 C. J., p. 353, n. 46.
Corporations, 14a C. J., p. 405, n. 91.
Evidence, 22 C. J., p. 1108, n. 23.

From Multnomah: L. P. HEWITT, Judge.

Department 1.

REVERSED.    REHEARING DENIED.

For appellants there was a brief over the name of *Messrs. McCamant & Thompson* with an oral argument by *Mr. W. Lair Thompson.*

For respondent there was a brief over the name of *Messrs. Winter & Maguire* with an oral argument by *Mr. Robert F. Maguire.*

BURNETT, J.—The plaintiff, an individual, sues the three defendants as members of a partnership called the Northwest Bridge & Iron Company and declares that on June 14, 1920, the defendants, at that time engaged in the construction of seven steel vessels, made a requisition upon him to furnish labor and material for the painting of those vessels, which he accepted. The requisition and acceptance are as follows:

"NORTHWEST BRIDGE & IRON COMPANY.
"Purchasing Department.
"Requisition No. 3717,
"Portland, Oregon, June 14, 1920.
"J. A. Graef,
Portland, Oregon.
"Please ship the following material to NORTH-WEST BRIDGE & IRON CO., JEFFERSON ST., Portland, Ore.

---

"Description.

---

"Furnish all material and labor for painting our Hulls known as 40–46 inclusive, using first-class materials in accordance with plans and specifications, and all work to be done subject to approval of our Engineers and Owners representative.

"Price of this work to be $22,685.00 per boat, you to carry State Insurance on all your men in the yard, and protect the Northwest Bridge & Iron Co. from all claims, liens, etc.

"We reserve the right to purchase material for this work, or to designate where the material shall be purchased.

"This requisition is made in duplicate. Would ask you to please sign one and return.

---

"Distribution: Hulls 40–46 inclusive.

---

"Accepted: NORTHWEST BRIDGE & IRON Co.
"J. A. GRAEF.        (Signed)  WARD C. SMITH,
"Purchasing Agent.
"No. 3717."

The execution of this paper by both parties is admitted. The complaint goes on to state, in substance, that at the time of the delivery and acceptance of the requisition, it was the custom of shipbuilding plants generally to require workmen employed therein to work only eight hours per day and five and one-half days

per week, but that for all work on any day over eight hours or for work on Saturday afternoon or any time on Sunday double the ordinary wages should be paid; that at the time of the execution and acceptance of said requisition, the defendants represented that in the construction of the vessels they would only employ a single shift of workmen, working eight hours per day and five and one-half days per week, and it was contemplated by both parties that plaintiff's bid for painting the hulls was based on the mutual understanding that only a single shift of men was to be employed eight hours per day. The complaint further, in substance, states that about March 1, 1921, the defendants, acting by and through their general superintendent, notified the plaintiff that it was necessary that work on hulls Nos. 43 to 46 inclusive be speeded up and demanded of the plaintiff and ordered him to furnish additional labor and to order all his workmen to work overtime, stating that the defendants, upon submission of plaintiff's bill for extra expense by reason of paying overtime to his employees, would have said bill approved and would pay the plaintiff the additional costs thus incurred. Claiming that this imposed upon him an additional burden and relying upon that promise, the plaintiff did work his men overtime and was compelled and did pay to his employees $3,628.46 for overtime, which sum was the reasonable value thereof and, though demanded, the defendants have not paid the same.

Denying the complaint in material particulars, especially in the matter of demanding overtime service from the plaintiff or promising to pay therefor, the defendants set up the contract already stated, and aver that a reasonable time within which to complete the contract was at the time of the completion of

the construction of each boat, and that when the painting of each of said boats was finished the defendants paid to the plaintiff the full sum of $22,685 therefor.

For a second further and separate defense, the defendants set up the contract as before and aver that it was the custom in the shipyard of the defendants and of painting contractors in said yards, and the uniform custom in all other shipyards in which steel hulls were constructed in the City of Portland, Oregon, and of painting contractors and builders of steel hulls in said shipyards, that the painting should be completed when the construction of each such hull was completed, all of which was universal in the shipyards in Portland in which the steel hulls were constructed; that both the plaintiff and defendants had knowledge thereof at the time of making the contract and at the conclusion of painting such hulls, defendants paid the plaintiff the full contract price.

For a third further and separate answer, the defendants plead in detail that at the completion of each of said hulls the plaintiff presented a written statement of his claim for the painting of such hull, which the defendants paid in full.

The plaintiff denies all the new matter in the answer except as stated in the reply. The substance of the new matter in the reply is that the work was done in accordance with the working agreement set forth in the complaint; that during the progress and completion of each boat, plaintiff rendered statements to the defendants before he had submitted his statements for overtime and prior to the defendants' refusal to pay that claim for overtime; that there was no agreement that the payments made by defendants upon the statements rendered were to constitute payment, settlement or accord and satisfaction of plaintiff's claim for overtime, and no consideration was

offered by or passed to the plaintiff for any agreement wherein the plaintiff would accept said payments as in full accord and satisfaction of his claim for overtime.

The case was tried before the Circuit Court and a jury. A verdict and judgment were rendered for the plaintiff and the defendants appeal.

1. The principal error assigned by the defendants is that the court erred in admitting testimony offered by the plaintiff relating to conversations he had, before the contract was signed, with the defendants' superintendent of construction as to whether there would be any necessity for figuring overtime charges in the progress of the work.

It is codified in Section 13, Or. L., thus:

"When the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms, and therefore there can be between the parties and their representatives or successors in interest, no evidence of the terms of the agreement, other than the contents of the writing, except in the following cases:

"1. Where a mistake or imperfection of the writing is put in issue by the pleadings;

"2. Where the validity of the agreement is the fact in dispute But this section does not exclude other evidence of the circumstances under which the agreement was made, or to which it relates, as defined in section 717, or to explain an ambiguity, intrinsic or extrinsic, or to establish illegality or fraud. * * "

It is well established by the precedents in this state that previous negotiations become, so to speak, crystallized and fixed in the ensuing written agreement, which is the sole utterance of the covenants of the parties where no attack is made upon them for fraud or mistake, or to impeach their validity. No such attack is made upon the agreement in question. The

defendants requested the plaintiff to perform certain work and furnish certain material. He accepted the offer of the defendants to pay a certain fixed sum for the work and material furnished upon each vessel. The legal effect of this instrument and its acceptance is that the plaintiff assumed the role of contractor whereby, using his own devices and materials, he was to furnish a certain complete result for the defendants. Under such conditions, the subject of hours of labor had no place in the calculations between the plaintiff and defendants. Possibly, it might have become a question between the plaintiff and his own employees but with such a dispute the defendants had nothing to do. The court was in error in admitting testimony about what was said between the plaintiff and the superintendent of construction employed by the defendants, prior to the execution of the contract.

2. A further contention is that the court erred in admitting in evidence a conversation said to have taken place between the superintendent of construction and the plaintiff after the work had progressed, relating to speeding up the construction of the remaining four vessels. A Mr. Brown was the superintendent of construction referred to. He testified for the plaintiff that he was general superintendent in complete charge of construction for the defendant firm. There is testimony to the effect that the plant of the defendants was so arranged that all contracts for the furnishing of labor and materials used in the construction of vessels was to be made with the purchasing department. The plaintiff testifies as follows:

"Q. Now, when you were discussing with Mr. Walter Brown and he was telling you that in building these tankers they had a certain length of time and that it would be a conservative program, a slow and conservative program, why did you not sign up a contract there?

"A. Well, it was not necessary; I signed it up with the Northwest Bridge & Iron, and Mr. Brown was superintendent of the yards and I took whatever statement he made to me as reliable.

"Q. Yes, but you knew when you come to make the contract and submitted a bid for the work, and put the contract in writing on paper, that you would have to go to the purchasing department?

"A. In certain respects, yes; I did go to the purchasing department when I didn't receive what was claimed, and I was told how it was.

"Q. (Interrupting.) Referring to this contract to paint these seven tankers, you knew that you would have to make that contract with the purchasing department?

"A. Yes, sir.

"Q. And that is where you went to make it?

"A. Yes, that is where I presented my bid to the company, Northwest Bridge & Iron Company, and the purchasing department sent me a requisition in acceptance of the contract.

"Q. .Didn't you go to the purchasing department and present your bid to Ward Smith?

"A. Oh, yes, yes."

With reference to making a contract the witness Brown testified as follows:

"Q. You went to the office department to get the contracts made, and the office department made the contracts with the sub-contractors?

"A. That is the way it worked, yes.

"Q. I believe you stated on your direct examination that if you wanted to work a number of men overtime, that you went to the office and discussed it with Mr. Bowles and got his authority?

"A. Undoubtedly, so the management would know how the institution would be running at all times."

The question principally for consideration at the present juncture is whether there was real or apparent authority in Brown to make a contract, either new or in modification of the admitted contract, to

pay for overtime. The witness Brown was called by the plaintiff and testified as part of the plaintiff's case. Speaking about speeding up the work, Brown gave the following testimony on direct examination:

"Q. Do you recall or recollect an occasion, Mr. Brown, of receiving word from any of the defendants in this case, either Mr. Cullers or Mr. Bowles or Mr. Banks, to rush the construction of the last four hulls?

"A. Yes, sir.

"Q. What were those instructions? * *

"A. Well, the instructions were to speed up and get the boats in the water just as fast as we possibly could.

"Q. After you had received these instructions from Mr. Cullers, what, if any, measures did you take to speed up the construction of the ships?

"A. I tried to instill a little more pep into the whole crew.

"Q. At or about that time, I will ask you whether you had any conversation with Mr. Graef with regard to the acceleration of the construction of these ships? * *

"A. Well, when I had a conference or a meeting in my office with the general superintendent, down to my meeting quartermen in the discussion of the speeding up, or speeding up the program to a certain extent, Mr. Graef happened in with one or two of the other subcontractors; I immediately notified them of the fact or to the effect that we intended to speed up the program a little; that that was the orders from the office, and that they would be required to work a certain amount or some overtime, the same as the plant was doing.

"Q. What, if any conversation did you have with Mr. Graef upon the subject of pay for this extra time? What did Mr. Graef say to you about that and what did you say to Mr. Graef? * *

"A. Well, when I mentioned to Mr. Graef, in regard to his overtime, I says to him, I says, 'This will mean a lot more overtime than what you figured on; you take care of your overtime and I will O. K. it at the proper time.' "

On cross-examination in regard to this conversation with the plaintiff, Brown testified as follows:

"Q. Did you, Mr. Brown, report to the office, and by that I mean to Mr. Bowles, or Mr. Cullers or Mr. Banks, the conversation that you have just related as having had with Mr. Graef at the time the speeding-up order was given you?

"A. No, sir."

Concerning this conversation the plaintiff testified as follows:

"Q. Where and under what conditions did you learn of the proposed change in the method of construction or conditions under which the work was to be carried out? * *

"A. In the office of Walter Brown, the office of the superintendent, I learned that the boats were to be rushed; orders and instructions came from the main office that the last three hulls were to be rushed—expedited as fast as possible and that I would have to work considerable overtime and get these boats out; previously we had been doing some overtime but not in proportion to these last ones; I said at that time—I said to Mr. Brown, 'That will incur considerable additional expense.' He said, 'You go ahead; that is my orders; you go ahead and do it and I will O. K. your bill on presentation to me.' * *

"A. Well, Mr. Brown said to me that I would have to proceed more rapidly with the work; put in considerable overtime, as the orders from the office were to rush the work all the time; and I would have to be there and stay with it and when the work was completed I would put in my bill and he would O. K. it; that was the conversation we had."

All this testimony for the plaintiff went in over the objection of the defendants, to the effect that it was immaterial and incompetent, and an attempt to bind parties to this action by the conversation of a man who had no authority. Upon the testimony quoted

above depends the validity of the alleged contract, said to be made during the progress of the work, to pay the plaintiff for overtime.

It is very plain under the precedents and Section 713, Or. L., that no reliance can be had upon conversations with the superintendent of construction had prior to the execution of the written contract set up in and admitted by the pleadings. The testimony shows that the plaintiff knew that it was necessary to go to the purchasing department of the defendant concern to make contracts. The only conclusion to be drawn from the testimony as to the authority of Brown was that he was the executor and not the author of contracts with the firm of which he was the employee.

3, 4. It is a well-settled principle that one who deals with another as the agent of a third party does so at his peril. It is likewise a principle set forth in *Portland* v. *American Surety Company,* 79 Or. 38 (153 Pac. 786, 154 Pac. 121), cited by the plaintiff, that:

"As to third persons, the principal is bound by the acts of his agent not only when executed in pursuance of actual authority, but also in the scope of his apparent authority arising from the manner in which his principal has held him out to the public. Apparent authority and its effect vanish, however, in the presence of actual knowledge of the third party as to the real scope of the agent's authority, or when the former has knowledge of facts which would put him upon inquiry as to the actual warrant of the agent."

What was the authority, as disclosed by the testimony, conferred upon Brown by the defendants with respect to speeding up the work? It is found solely in the testimony of Brown upon that subject. He said, as already quoted:

"Well, the instructions were to speed up and get the boats in the water just about as fast as we possibly could."

Certainly that does not contain any intimation that the defendants intended to modify the existing contract or to make a new one. The agent would exceed his actual authority, even if this were all that were said upon the subject, if in relying on that as his warrant he promised that the defendants would pay for overtime. Moreover, all that either Brown or the plaintiff say on that subject is that the plaintiff should keep an account of his overtime, put in his bill, and Brown would "O. K." it. All that this can possibly mean in the light of the testimony is that Brown would certify that the work had been done and, according to the testimony, that applied to every contract for work in the enterprise. Its only effect was to inform the purchasing department with whom the contract had been made that the work recited had been done. There can be derived from this language of Brown, as narrated both by him and the plaintiff, no promise to pay anything.

5. It is urged by the plaintiff that the defendants received the benefit of the expedition of the work brought about by Brown's statement and, being thus bettered, should pay. It is admitted that nothing more was done than to perform the work called for by the contract and it is admitted that the contract price agreed upon was paid in all cases. It would be a strange anomaly, if, whenever an employer urged haste in the completion of a contract, he would be compelled to pay more than the contract price. The plaintiff agreed to produce a certain finished result for a certain declared price. Under such circumstances he cannot rightly pad his pay-roll with double-

price labor without a new contract upon a sufficient consideration. His performance of the work would not be such a consideration because he had already agreed to perform that same labor.

6. It seems that during the progress of the work some painting of bedsteads that were to be put into the vessels was ordered by Brown without previous authority from the purchasing office and the plaintiff relies upon this as establishing the authority of Brown to bind the defendants for the payment of his present overtime charge. Conceding for the sake of argument that Brown's conversation with the plaintiff amounted to an agreement to pay for the overtime, yet that single instance of directing him to paint some bedsteads without a previous requisition would not amount to such a holding out of Brown as their agent as would bind the defendants.

It is stated in 14a A. C. J., page 404, thus:

"As a general rule the agency and authority of an officer or agent may be proved by evidence of his having previously exercised certain powers as officer or agent with the approval or recognition of the corporation, and this rule applies to evidence as to the authority of the president to do a particular act or make a particular contract; and on the other hand evidence that the officer or agent had never performed similar acts is admissible to disprove his authority in the particular instance. But a special authority to do a particular act or make a particular contract in a single instance or a few isolated instances is no ground for inferring an implied authority to do other acts or make other contracts, generally of the same kind, with other persons, and evidence thereof is not admissible."

In brief, Brown had no authority, as disclosed by the testimony of the plaintiff, to make any contract modifying or superseding the original contract. He

did nothing more than to urge the plaintiff in common with other contractors to hurry the work. In promising to ''O. K.'' the plaintiff's bill for overtime, he did nothing more than to agree that he would report it to his employers. It cannot be construed as a contract to pay. Moreover, the plaintiff admittedly knew that the only place with which he could contract with the defendant firm was at the purchasing department. That was the course of business which he had followed in the first place and he knew the requirement.

7. Still further, before the defendants can be held to have ratified the action of Brown in his conversation with the plaintiff, they must have knowledge of the transaction and the testimony is undisputed that neither the plaintiff nor Brown, or anyone else, gave any information to the defendants about that conversation. The plaintiff was in court without competent or sufficient evidence to support any new or modifying contract. The written memorial which the parties agree was executed is the sole legal evidence of any contractual relations between the parties. The directed verdict in favor of the defendants for which they moved at the close of the testimony should have been allowed.

The judgment of the Circuit Court is reversed and the cause is remanded with directions to enter a judgment in favor of defendants.

REVERSED AND REMANDED WITH DIRECTIONS.
REHEARING DENIED.

RAND, J., being absent, did not participate in this opinion.

McBRIDE, C. J., and COSHOW, J., concur.