Argued September 5; affirmed October 24, 1939

# METROPOLITAN LIFE INSURANCE CO. *v.* KIMBALL ET AL.

(94 P. (2d) 1101)

In Banc.

*Percy A. Cupper* and *Carl T. Pope,* both of Salem, for appellants.

*Verne Dusenbery,* of Portland (Crum & Dusenbery, of Portland, on the brief), for respondent.

ROSSMAN, J. This is an appeal by Sarah A. Kimball, Mary Hortense Kugel and K. Burgard Kugel, three of the eight defendants, from a judgment and decree of the circuit court which grants judgment against them upon a promissory note signed by these

three appellants and orders foreclosure of a real estate mortgage executed by them to secure payment of the note. Both note and mortgage were also executed by S. P. Kimball, another defendant, who died before entry of the judgment. The real property at the time of the execution of those two instruments was owned by S. P. Kimball and his wife, the aforementioned appellant, Sarah, as an estate by the entirety. After the execution sale a deficiency of $1,804 remained for which the three appellants are liable by the terms of the decree. They attack only that part of the latter which renders them liable for the deficiency, and in support of their appeal contend that the plaintiff had bound itself by estoppel, if not by contract, to accept a deed to the property which the four obligors had signed.

The facts are virtually free from dispute. The issues concern the inferences to be drawn from them.

The property with which we are concerned is a prune orchard, approximately one hundred acres in extent, located in Polk county. In 1926 while the Kimballs owned this property, subject to an interest held by one Henry Voth which the latter subsequently released, Voth and S. P. Kimball entered into a contract with the Puccinelli Dehydrater Company whereby the latter, in consideration of the sum of $18,000 to be paid largely in the future, built upon the property a prune dryer. The dryer consisted in part of two fireproof buildings each fifty-two feet by twenty-three and one-half feet in ground dimensions. One of the buildings served as a warehouse and sorting room, and the other contained the dryer equipment. In the dryer building were two compartments constructed of concrete and hollow tile known as the drying tunnels. The heat was furnished by two furnaces each weighing two tons and each

equipped with an oil burner which in turn was connected by pipes to an underground oil tank. We shall not pause to describe the hydrometers, the weighing scale, the electric wiring, the four fans, the four electric motors, etc., which were parts of the plant's equipment, but shall now mention in brief detail the tracks, trucks and trays which constituted other parts of the plant. The tracks, set in concrete, extended through the drying kilns. For operation upon them the Puccinelli Company supplied 80 four-wheeled trucks constructed of steel. It also supplied a large number of trays. Prunes to be dried were placed upon the trays which in turn were set upon the trucks and then the latter were moved into and slowly through the drying kilns by means of car movers operated from outside of the plant by cables and other equipment. In this way the prunes moved through the plant in the process of being dried. This description of the plant will suffice for our purposes.

The contract with the Puccinelli Company was signed May 4, 1926, and, as already stated, required the payment of $18,000. Fifteen hundred dollars of the latter sum was payable concurrently with the execution of the agreement, $3,500 was payable when construction had been completed, and the balance in annual installments. The contract provided:

"It is further agreed by and between the said Owner and Contractor that the title to trays, burners, fans, motors, hydrometers, furnace, tracks, carriers, doors or any material or equipment moved onto said premises or caused to be moved onto said premises by said Contractor shall not pass to said Owner or claim to have passed to said Owner or any person whatsoever save Contractor until said last payment be made as aforesaid or withheld in whole or in part in accordance with the authority given the Owner hereinabove."

The defendants' brief states that the contract was recorded in 1932. Certainly, it was not recorded prior to that time.

In the early part of 1927, after the plant had been completed, the Kimballs applied to the plaintiff for a loan of $10,000, payment to be secured by a real estate mortgage upon the prune orchard property. April 1, 1927, the loan was made and the mortgage with which we are now concerned was then executed and recorded. The note was payable January 1, 1937. In applying for the loan, Mr. Kimball, according to W. C. Feldman, representative of the plaintiff's mortgage loan department, told Feldman that "his total liabilities were ten thousand dollars. * * * He said that he had subscribed for stock in a linen mill and that he felt he should pay for that stock and that he was borrowing in order to pay for that stock." This testimony is not contradicted. Kimball told Feldman nothing about the sums unpaid upon the dehydration plant contract. Before the loan was made Feldman inspected the property. He swore that when he recommended that the loan be made he deemed the dryer a valuable adjunct to the property and thought it materially enhanced the value of the property. The evidence indicates that a dryer is a very valuable part of a prune orchard and that an orchard without one has little value. The evidence justifies a conclusion that the plaintiff was ignorant of the fact that anyone but the Kimballs had any interest in the dehydration plant.

After the plant had been built the Puccinelli Company assigned its interest in the contract to R. L. Puccinelli. November 10, 1933, Puccinelli instituted an action against S. P. Kimball and Henry Voth in which he sought to recover a judgment upon the un-

paid contract balance. April 10, 1934, the parties to that action effected an agreement whereby Puccinelli dismissed his action and Kimball executed and delivered to Puccinelli two mortgages, one a chattel mortgage upon virtually all of the chattels forming a part of the prune orchard property, and the other a real property mortgage which described the orchard property; the latter mortgage was, of course, a second mortgage. As a part of the same transaction Puccinelli was given possession of the property. The chattel mortgage, which we just mentioned, stated:

"It is not intended hereby to mortgage or convey any of said dehydrater equipment or accessories which have become a fixture to said real property, or any property upon which the Metropolitan Life Insurance Company now has a lien."

Some time after the execution of the two mortgages just mentioned the chattel mortgage came into a condition of default, and in December, 1936, the Kimballs executed and delivered to Puccinelli a bill of sale which described as the articles transferred the same property which constituted the subject-matter of the chattel mortgage. It stated:

"It is not intended thereby to mortgage or convey any of said dehydrater equipment or accessories which have become a fixture to said real property or any property upon which the Metropolitan Life Insurance Company now has a lien."

January 4, 1937, being a few days after the execution of the bill of sale, Mr. Percy Cupper of Salem, attorney for the Kimballs, in a letter informed the plaintiff of the execution and delivery of the bill of sale. His letter, from which we now quote, stated that the

property mentioned in the bill of sale was described as follows:

"All trays, cars, equipment and accessories located in that certain Puccinelli Dehydrater Plant now situated and being in the Northeast corner of Llabmik Orchards, Polk County, Oregon.

One Fordson Farm Tractor
One Power Sprayer
One Disk Harrow
One Spring-tooth Harrow
One Ford Truck
One Wagon

It is not intended thereby to mortgage or convey any of said Dehydrater equipment or accessories which have become a fixture to said real property or any property upon which the Metropolitan Life Insurance Company now has a lien."

In December, 1936, Puccinelli took from the dehydration plant virtually all of its equipment. When he had completed the removal there remained virtually nothing except the building, the inside tunnels and the underground oil storage tank. In the removal of this equipment pipes were unfastened where that was necessary, wires which supplied motors with electrical current were cut, the nuts which fastened motors to the stationary parts were unscrewed, and, in some instances where the units would not yield, chisels were resorted to and the necessary force applied until iron fasteners were cut in two. Since the furnaces were set in firebrick and could not be moved until the latter had first been displaced, the bricks were disconnected and the furnaces were then taken from their settings. In this manner the building was stripped of its equipment.

October 29, 1936, Mr. Kimball, anticipating his inability to discharge the $10,000 note payable to the plaintiff January 1, 1937, began a course of corre-

spondence with the plaintiff in which he at first sought an extension of the time of payment. His letters, as well as all the others to which we shall shortly refer, were addressed to the Spokane Farm Loan Division of the plaintiff. The correspondence between the parties failed to yield a result. About this time the amounts needed to discharge the mortgage obligations were $10,000 principal, $582.88 interest, and $522.72 delinquent taxes. January 8, 1937, after the note had become due and was unpaid, Mr. Cupper wrote to the plaintiff a letter in which he stated that Mr. Kimball had "no immediate prospects which would enable him to meet the principal, interest and taxes on your mortgage and the property," and added that Kimball was "advanced in years and desires to avoid litigation." He then stated that Kimball "would convey the property to you if you so desire. As you doubtless know, Mr. Puccinelli's second mortgage is also a second mortgage on other property belonging to Mr. Kimball. In view of the fact that it would avail him nothing in the event of foreclosure to hold his second mortgage against the property on which you have a first mortgage and could only result in troublesome litigation, I believe he could be prevailed to give a partial release of his second mortgage * * * Let me know if you would care to accept a deed to the property free from all incumbrances except your mortgage and taxes." January 14, 1937, J. H. Peters, manager of the Spokane branch of the plaintiff's farm loan division, answered Mr. Cupper's letter, stating: "There is some question whether our company would be willing to accept deed in lieu of foreclosure." He added some suggestions which if embraced by Kimball or Puccinelli would have extended the mortgage. This letter was succeeded by a further exchange of correspondence, and, finally,

Peters mentioned the possibility of "an informal exten-sion" of the mortgage to be granted if the mortgagors discharged the delinquent interest and taxes and main-tained the fire insurance policy upon the property. However, by February 2, 1937, Peters had apparently become satisfied that the mortgagors either could not or did not care to gain an extension of the mortgage. On that day he wrote to Mr. Cupper:

"In the event the necessary arrangements could be made with our Home Office for a deed to be given by Mr. and Mrs. Kimball in lieu of foreclosure, it is under-stood, of course, that such a procedure would convey a good title and that all liens and encumbrances subse-quent to our mortgage would be cleared of record. In other words, the only encumbrance would be our mort-gage and taxes. Your letter indicates that you would endeavor to clear the property from all encumbrances except taxes and our mortgage in the event that our Home Office would approve taking deed in lieu of fore-closure. * * * We would also like to have you ad-vise us as to the present status of the farming of this land, the name and address of the party who operates it as tenant, and what the lease provides for in the way of rental. In fact, give us as full information as you possibly can in regard thereto."

Peters then added that in the event circumstances required him to suggest to the company's home office the acceptance of a deed he would have to accompany his recommendation with a "delinquent report" and for that purpose enclosed a blank form. The letter concluded with a hope that a means could yet be found to avoid foreclosure. February 18, Cupper sent the requested delinquent report. March 16, Peters again wrote to Cupper. From this letter we quote:

"This is to advise that we have heard from our Home Office in regard to the matter of taking deed from Mr. and Mrs. Kimball in lieu of foreclosure.

This arrangement is satisfactory, providing such a procedure passes good title and is approved by our attorneys. In other words, upon continuation of the abstract and examination thereof by our attorneys he finds no subsequent liens to the mortgage held by the Metropolitan Life Insurance Company except such as can be released of record, we are authorized to take deed in lieu of foreclosure.

If the Metropolitan Life Insurance Company finds that it can get good title through deed in lieu of foreclosure, it will release its mortgage and surrender the cancelled papers, and in case it is necessary to foreclose the mortgage held by the Metropolitan Life Insurance Company in order to get permanent title to the property, it will then bid the full amount of the indebtedness due under the mortgage at the foreclosure sale, thus leaving no deficiency judgment.

You advised us recently that in case satisfactory arrangements were made with our Home Office for the matter to be handled in this way you would arrange to clear the property from all encumbrances excepting taxes and our mortgage. As you know, a second mortgage is held by R. L. Puccinelli of Livingston, California, and it is our understanding that you will arrange for a release of the same as far as this land is concerned.

This matter is being referred today to our attorney at Portland, Oregon, Mr. Stephen H. Boyles, who will get in touch with you in due course in regard to having the Warranty Deed executed by Mr. and Mrs. Kimball, and also clearing the property of all encumbrances except the taxes and our mortgage. * * *''

Following the plaintiff's selection of Mr. Boyles the latter and Cupper exchanged correspondence in which Boyles mentioned the documents and instruments which he believed were necessary to convey to the plaintiff the required title. In the first of these letters Boyles, after commenting upon the condition of the title, stated: ''I will desire to make a trip to Salem in

connection with the acceptance of the deed and checking up various matters not shown in the abstract." In his opinion concerning the title, which is addressed to the plaintiff and which specifies by number five items which required attention, Boyles concluded with the following: "Before accepting a deed to this property it will be necessary to have items 3 and 4 satisfactorily cleared in addition to any other matters which may be disclosed by personal investigation as to possible claims of third parties." Boyles sent a copy of this letter to Cupper to facilitate the latter's progress with the work of obtaining the necessary title instruments. Cupper obtained signatures to virtually all, if not all, of the papers requested by Boyles. Before any of them was delivered the developments which we will now relate took place.

When the correspondence concerning the preparation of the necessary title instruments had reached the above point, Feldman, the aforementioned representative of the plaintiff's mortgage department, made a visit to the property and discovered that the equipment of the dehydration plant had been removed. He promptly reported his discovery to the plaintiff's Spokane loan division which requested him to obtain a copy of the bill of sale which the Kimballs had given to Puccinelli. In order to obtain the copy Feldman called upon Cupper and while discussing the matter stated that the dehydration plant had been stripped of its equipment. As a witness, he described the attorney's reaction to this statement thus: "Mr. Cupper expressed great surprise that so much should have been taken from the building, although he felt that it might have been all right to take the trays and the carts." It seems clear that in all of the aforementioned nego-

tiations and correspondence Mr. Cupper was wholly unaware of the fact that Puccinelli had removed the property which we have already described. When Boyles was apprised of the above developments he requested Cupper to proceed no further with his work. There the matter ended.

The above, we believe, is a fair summary of the evidence.

The plaintiff, of course, contends that the above facts indicate that the judgment based upon the note must be sustained, and that the decree ordering the foreclosure of the mortgage follows as a matter of course. The defendants argue that the above facts show that the plaintiff agreed for a valuable consideration to accept a deed to the property and that, therefore, it is not entitled to any decree which subjects the defendants to a deficiency judgment. They argue that if the evidence does not show that a contract was effected, it at least shows that the plaintiff has become estopped from insisting upon a deficiency decree. The plaintiff, in meeting these defenses, contends that the correspondence does not show that it ever bound itself to accept a deed; that the equipment in the dehydration plant were fixtures which had become a part of the soil, and that in pursuing its correspondence with the defendants it was laboring under a mistaken impression that the fixtures were still upon the property and would pass to the plaintiff by the contemplated deed.

■■ Whether the equipment which was removed from the dehydration plant had become fixtures and as such a part of the freehold is to be determined, we believe, by common well-established principles of law. No novel issue is presented. As was said by Mr. Justice

Henry J. Bean in *Johnson v. Pacific Land Co.*, 84. Or. 356, 164 P. 564:

"A fixture is an article or thing which was personal property but which, by being physically annexed or affixed to real property, becomes accessory to the real property and part and parcel of it: 13 Am. & Eng. Enc. Law 596. Fixtures attached by an owner to land subject to a mortgage come under the lien of the mortgage and cannot be removed without the consent of the mortgagee. This is true whether annexation was before or after the execution of the mortgage."

■ The principles which determine whether the equipment in question had become part and parcel of the freehold are expressed as well as can be, we believe, by Mr. Justice Robert S. Bean in *Helm v. Gilroy*, 20 Or. 517, 26 P. 851. From that decision, we quote:

"It has often been remarked that the law of fixtures is one of the most uncertain titles in the entire body of jurisprudence. The line between personal property and fixtures is often so close and so nicely drawn that no precise rule has or can be laid down to control in all cases. Each case must depend largely on its own particular facts. The reports and text-books are filled with decisions and discussions of this question, but none of the rules laid down are infallible or of universal application. We shall not attempt to quote from them, nor enter into any detailed discussion of the question. We could not hope to throw any new light upon the vexed question. The weight of modern authority keeping in mind the exceptions as to constructive annexation, admitted by all the authorities to exist, seems to establish the doctrine that the true criterion of an irremovable fixture consists in the united application of several tests: (1) Real or constructive annexation of the article in question to the realty. (2) Appropriation or adaptation to the use or purpose of that part of the realty with which it is connected. (3) The intention of the party making the annexation, to make the article a permanent accession to the freehold, this intention

being inferred from the nature of the article affixed, the relation and situation of the party making the annexation, the policy of the law in relation thereto, the structure and mode of the annexation and the purpose or use for which the annexation has been made."

In that case machinery, constituting the equipment of a sash and door factory, was held to have become a fixture. It was attached to the building by screws, bolts, pulleys and bands, by one Gilroy who had bought it under a conditional sales contract which reserved title in the vendor until the entire purchase price had been paid. Later Gilroy executed a mortgage which did not mention the machinery but described the land upon which it was situated. The plaintiff was the assignee of this mortgage. Two days after the execution of the mortgage Gilroy made an assignment for the benefit of his creditors to the defendant Rogers who then paid the balance due upon the machinery ($879.89) and received a bill of sale. At this point the plaintiff instituted the suit under review to foreclose his mortgage; it averred that the machinery was a part of the realty. In sustaining that contention, this court, in addition to the above, said:

"It is true the screws and bolts with which it was annexed could have been taken out and the machinery removed without serious damage to it or the building, but so no doubt could have been the doors and windows. It was in its very nature adapted to the business for which the land was used. The party making the annexation must have intended that it should remain as long as it continued serviceable."

In *Johnson v. Pacific Land Co.*, supra, the controversy concerned a pump, motor and tank which constituted part of the water system of a farm home. The controversy was between parties who sustained to each

other the relationship of mortgagee and mortgagor. In holding that the articles had become fixtures, the decision stated:

"Articles which enhance the comfort of a home such as water pipes, water tanks, cisterns, etc., are as a rule considered fixtures when attached in the usual manner. * * * Counsel for defendant argues that the chattel was not injured by the removal. That may be true, but how about the real estate that was left behind? The jury found that that was denuded and injured."

In *First State and Savings Bank v. Oliver*, 101 Or. 42, 198 P. 920, wherein the controversy was between a chattel mortgagee and the owner of the freehold, this court, in holding that the chattels (equipment of an irrigation system) had become fixtures and as such accessory to the realty, said:

"Applying these rules to all the facts and circumstances in the present case, we note that it is apparent that Mr. Reames, or whoever installed the irrigation system on the farm, did so with a view to enhancing the production of the farm, to increase the growth of vegetation thereon. Irrigation in a semiarid region, like parts of Klamath County, is the very life of the land. It is beyond comprehension that the system was installed for any temporary purpose. The motor and pumps served the purpose of ditches, canals and head-gates of a gravity system of irrigation, which are no doubt appurtenant to real property. The pumping system was doubtless placed upon the land to improve it and make it more productive and valuable and more agreeable for a habitation. The purposes for which the three articles were used indicate strongly that they were intended to be part and parcel of the land. They were adapted to the purpose of the land to which they were attached. The annexation made was sufficient to stand the first test mentioned. While the motor was sometimes detached from one pump and moved to and connected with the other part of the system, it was

never, so far as shown, disconnected or removed from the ranch. The pumps were permanently annexed to the freehold, and the motor was a part of the system which comprised the pumps.".

In *Dunn v. Assets Realization Co.*, 141 Or. 298, 16 P. (2d) 370, 17 P. (2d) 1118, the controversy concerned twenty-one electric ranges which had been installed in an apartment house by its owner. The parties to the suit were a real estate mortgagee who had foreclosed and the conditional sales vendor of the ranges. The ranges were connected to the structure, so the decision states, "by means of a plug in much the same manner that an electric lamp is connected. It is stated that they were also attached by means of a vent pipe from oven outlet to flue." After declaring that the general tests are annexation, adaptation and intention, the decision continued: "The tendency found in modern decisions is to stress the third test—that of intention—making it controlling where there is doubt as to the effect of the two others." After commenting upon the fact that coal ranges, floor lamps and radio receiving sets are never attached with any thought of making them a part of the realty, the decision held that the electric ranges were not fixtures.

In *Roseburg National Bank v. Camp*, 89 Or. 67, 173 P. 313, Mr. Justice HARRIS added to the discussion contained in the above-reviewed decisions the following:

"The relation and situation of the party making the annexation is an important factor and must be taken into consideration when attempting to ascertain his intention. The rule governing a grantor and grantee would likewise control a mortgagor and mortgagee and hence whatever would be an irremovable fixture as between a grantor and grantee would also be deemed realty as between a mortgagor and mortgagee. When

an article is annexed by a tenant a more liberal rule is applied so that what would be deemed to be realty as between a vendor and purchaser might be no more than a trade or domestic fixture as between a landlord and tenant. * * * When additions are made to land by the owner the purpose is usually to enhance the value and to be permanent; but on the other hand when additions are made by a tenant they are usually made for a temporary purpose and not with a view of making them a part of the land; * * *"

In *McFeron v. Doyens*, 59 Or. 366, 116 P. 1063, the plaintiffs were mechanic's lien claimants who sought to establish liens upon a plant which the defendant owned and which he claimed was a portable sawmill. The decision stated:

"But even if the mill had been what is known as a portable mill yet when erected upon the land and imbedded in brick and mortar foundation it may become a fixture."

In *Landigan v. Mayer*, 32 Or. 245, 51 P. 649, 67 Am. St. Rep. 521, in which the controversy was between a real estate mortgagee who had foreclosed and the successor in interest to a conditional sales vendor, this court held that a planer, boiler, engine and governor installed in a lumber mill and held in place by screws, bolts, rods and belts, were fixtures.

In *Washburn v. Inter-Mountain Mining Co.*, 56 Or. 578, 109 P. 382, Ann. Cas. 1912C, 357, the controversy was between a conditional vendor of a twenty-stamp mill used as an adjunct of a quartz mine and miners' lien claimants. This court held that although the mill would be deemed personalty if the suit were between the vendor and the vendee, yet, since the mill had been attached to the land and the miners had no knowledge of the retention of title in the vendor, the court was bound

to regard it as a permanent accession to the realty and therefore a part of the latter.

The defendants contend that in *Maxson v. Ashland Iron Works*, 85 Or. 345, 166 P. 37, 167 P. 271, this court held that sawmill machinery was not a fixture. The facts were: The plaintiff had sold to one Johnson a quantity of sawmill machinery, under a contract which provided that the purchase price ($500) should be discharged by the delivery of some lumber to the plaintiff, and that until its delivery the title to the machinery should not pass. Later Johnson purchased from the defendant some additional machinery at a price of $925 payable in the future. He evidenced this indebtedness by a note and secured its payment with a chattel mortgage which described all of the machinery in his mill including that which he had obtained from the plaintiff. The contract between the latter and Johnson was not recorded, but the chattel mortgage given to the defendant was entered in the record. After Johnson had sold the machinery to a third party and had become bankrupt an officer took possession of the machinery in order to foreclose the defendant's chattel mortgage. At this juncture the plaintiff instituted an action of replevin which eventually resulted in the decision under review. Thus, it is seen that the plaintiff was a conditional vendor and that the defendant was a chattel mortgagee. The part of the decision upon which our present defendants rely is this court's discussion of an assignment of error which was predicated upon the circuit court's denial of the defendant's motion for a directed verdict. That part of the decision follows:

"It is unnecessary to the validity of a conditional sale that the contract therefor should be recorded unless the property, the title to which has been reserved, has been so attached to any real estate as to become a fix-

ture thereto: Section 7414 L. O. L. Personal property is not so attached if it can be removed without material injury to the articles themselves or to the freehold: Henkle v. Dillon, 15 Or. 610 (17 Pac. 148); Landigan v. Mayer, 32 Or. 245 (51 Pac. 649, 67 Am. St. Rep. 521); Hershberger v. Johnson, 37 Or. 109 (60 Pac. 838); Washburn v. Inter-Mountain Min. Co., 56 Or. 578 (109 Pac. 382, Ann. Cas. 1912C, 357). The testimony offered at the trial does not show that the machinery delivered by the plaintiff could not have been removed from Johnson's sawmill without inflicting the degree of injury adverted to; and hence no error was committed as alleged. Aside from this, as the defendant's title is derived from a foreclosure of a chattel mortgage, no question can arise as to fixtures since the right to the machinery is not connected with any real estate.''

Thus, in that case there was no controversy between a claimant to the personal property and the owner of the freehold. The plaintiff, a conditional vendee, and the defendant, a chattel mortgagee, had each regarded the machinery as personal property. We do not believe that decision contains anything which supports the present defendants' contentions.

█ It will be observed from the foregoing review of the facts in the instant case that the plaintiff is a mortgagee and that the dehydration plant was installed, not by a tenant for purposes limited to the term of a lease, but by the owner of the fee who apparently planned to remain upon the property indefinitely. These are material circumstances because it is more likely that the owner of the fee would attach to the soil valuable chattels with an intention of permanent improvement than would another who possessed a right to remain only for a limited time. As between mortgagor and mortgagee, valuable chattels, placed upon the land by the former and calculated to be of great

benefit to the property, are presumed to be a part of the land. The growing of prunes upon the property and their preparation for the market were the purposes to which this property was being devoted. The dryer plant, it was believed, would enable the orchard to serve this purpose in a more profitable manner. Thus the dryer was not foreign to the general purpose for which the land was being employed but was in harmony with it. It is no exaggeration to say that an affinity existed between the plant and the orchard. These facts indicate that the plant was appropriate and adapted to the realty. Next, the plant, or at least much of it, was physically annexed to the realty. A union was in fact established between parts of the improvement and the soil. For instance, the foundation and floors of the building in which the equipment was housed were made of concrete which, if the terms of the contract were observed, was poured into excavations made in the ground. In the pouring of the floor an aperture of appropriate size was fashioned and into this a set of scales was later fitted. This arrangement enabled trucks bearing trays of prunes to be readily wheeled upon the scales for weighing. The oil tanks which supplied the boilers were sunk below the surface of the soil, and the combustion chambers were not only lined with firebrick but were covered with masonry on the exterior. The doors of the heating chambers were made of iron and were so firmly fastened in place that they could not be removed until chisels had broken them from their fastenings. The base of the rails which entered the kilns was set into the cement floor. The record indicates that screws, bolts and other fasteners were the means by which the motors, fans and other units were fastened in place.

■ It is true that the trays were not fastened to any-thing and that the four-wheeled trucks likewise could readily be taken from the building; but both were parts of the plant which had been supplied by the Puccinelli Dehydrater Company under the terms of its contract. Juxtaposition or constructive annexation when accompanied with sufficient other elements suffices to convert a chattel into a fixture. The evidence indicates that the trays and trucks were especially adapted to prune dryer purposes. They were accessory parts, and without them the rest of the plant was incomplete. There is nothing in the record which shows that the owners had any different intention concerning the trays and trucks than they had concerning the furnace, the oil tanks, heating chambers, burners, etc. If the removable character of the trays and trucks was at variance with their constructive annexation, then many parts of any building would likewise lack the element of annexation. For instance, a key can be taken from a lock; the lock can easily be removed by a mechanic from its aperture in the door without harm to the latter; a door can be taken from its hinges without much effort even by a housewife; electric light fixtures can easily be disconnected; a basement furnace is held in place only by the force of gravity; faucets, bathtubs and other plumbing fixtures can readily be unfastened. In this manner, part by part could be carried away from any structure until finally nothing would remain except the excavation. Yet it is well established that all of these units, like the main structure itself, are part of the freehold, provided they are essential to the building's completeness and were incorporated in the latter as a result of a single purpose; that is, the building of a complete structure. 22 Am. Jur., Fixtures, p. 793, § 72, and

Thompson on Real Property, § 147. Our concern is, therefore, not with a single item but with the plant as a whole. The uncontradicted evidence shows that the empty buildings are useless and that the orchard without the dryer possesses little value. We have no doubt but that the entire plant—trays, trucks, furnaces, buildings, etc.—were constructed for the purpose of permanent improvement, and that the Kimballs intended that the plant should remain upon the property indefinitely. Intent, we believe to be entitled to pre-eminence in the application of the various tests, and we think that the Kimballs constructed this plant as a permanent accession to their realty. We also believe that all parties regarded the plant as a part of the freehold when the mortgage in controversy was executed.

■ The circumstances above described leave no doubt in our minds that the dehydration plant and all of its parts were fixtures which had become a part of the land, unless the fact that the improvement was made under a contract in which it was agreed that title should not pass until the contractor was paid in full preserved to the chattels their original character.

The defendants argue that, since the contract reserved title in the Puccinelli Company, the chattels did not become fixtures; or that, at least, an absence of intention that they become such was indicated. Section 64-201, Oregon Code 1930, which was enacted in 1909, says:

"All conditional sales of personal property or leases thereof containing a conditional right to purchase, where the property is thereafter so attached to any real estate as to become a fixture thereto, shall be void as to any purchaser or mortgagee of such real property unless within ten days after said personal property is placed in and becomes attached to said real property

a memorandum of such sale, stating its terms and conditions, together with * * * shall be filed in the county clerk's or county recorder's office * * *."

No one contends that the requirements of this statute were observed.

This court, before the enactment of that statute, had held that although, as between a conditional vendor and a conditional vendee, their agreement that title should not pass and that the chattel should not become a part of the soil would be respected, yet that a purchaser of the realty to which such property had become annexed and who had no notice of the restrictive agreement acquired title to the chattel as part of the land. See *Muir v. Jones*, 23 Or. 332, 31 P. 646, 19 L. R. A. 441. In that case a Mrs. Dennis, who owned a farm, constructed a small sawmill upon it with the intention of preserving the character of the machinery as personalty. She sold the land on which the mill was located to one Bowman, orally informing him that the sawmill was no part of the realty and that she reserved the right to enter upon the land and remove the machinery. Bowman sold the same land to one Fairchild and later Fairchild sold to one Stranahan. Both Fairchild and Stranahan knew of the reserved title. Stranahan sold to the defendant without informing him of the reserved rights. Mrs. Dennis, in the meantime, sold the mill including the machinery to the plaintiffs. In holding that the defendant, as purchaser of the land without notice of the restrictive agreement, became owner of the machinery, Chief Justice LORD said:

"* * * While, by agreement between the parties, barns or other structures, or fixtures, so attached to the soil as to become ordinarily a part of the realty, may be made to remain personal property, yet the general course of decisions is that a purchaser of land

on which such fixtures are located must have notice of such agreement, or he will be entitled to hold them as a part of the realty.''

In *Landigan v. Mayer*, supra, the facts were that one Tice purchased some sawmill machinery from a firm entitled Arthur & Company under a conditional sales contract which reserved title in the vendor until full payment of the price had been made. Tice installed the equipment in a sawmill which was later purchased by a corporation and then the latter executed a real estate mortgage to one Herrall which described the mill premises. The cause under review was begun by a foreclosure of the mortgage. Herrall became the purchaser upon the execution sale and claimed the machinery as a purchaser without notice. The plaintiff, as the assignee of the conditional sales contract, claimed that title had never passed. In reversing a judgment for the plaintiff, this court said:

''But where chattels are of such a nature as that they do not lose their distinctive identity by annexation, and do not thereby become so essentially a part of the structure as that their removal will materially injure or destroy the structure, or destroy or unnecessarily impair the value of the chattels, their original character may be preserved by agreement of the parties interested: * * * A purchaser, however, of the realty to which such property has become so annexed, for value, and without notice or knowledge of the distinctive character cast upon it by the agreement, will take it as a part and parcel of the realty, and his title will prevail as against those claiming under the agreement: * * *''

In a preceding paragraph we gave a resume of the facts in *Washburn v. Inter-Mountain Mining Co.*, supra. From the decision in that case we quote:

''However, when the mill is affixed to the soil, the situation is changed as to the rights of third parties

who are without notice of the terms of the agreement. When the chattel, which was sold for that purpose, has been affixed to the soil, a party dealing with reference to the realty upon which the mill is situated, without notice of the reservation in the agreement, will not be affected thereby; but, as to him, the mill will be treated as a fixture.''

See to the same effect *Blanchard v. Eureka Planing Mill Co.*, 58 Or. 37, 113 P. 55, 37 L. R. A. (N. S.) 133.

The following is taken from 22 Am. Jur., Fixtures, p. 733, § 22:

''The majority rule is to the effect that a retention of title by the seller of the fixture, or a chattel mortgage lien thereon, to secure payment of the purchase price, is ineffectual as against a subsequent bona fide mortgagee of the realty without notice. In the event, however, the subsequent mortgagee has notice, the retention of title or lien will be effectual against him; particularly if the property becomes an integral part of the real estate. On the other hand, there is authority for the view permitting the vendor of chattels to assert his reserved title or lien as against a subsequent bona fide mortgagee of the realty, although if the statute requires the conditional sale contract or mortgage to be filed and if such filing has been omitted, an exception to the minority rule is established and the vendor loses his rights. Moreover, under the minority view if the personal property becomes an integral part of the real estate, title passes to a subsequent mortgagee without notice.''

In *Miller v. McCarthy*, 148 Or. 310, 36 P. (2d) 346, this court construed § 64-201, Oregon Code 1930, the material parts of which we quoted in a preceding paragraph. It is apparent from what is there said that that section of our code is merely a statutory declaration of the law as previously stated by this court. In *Madfes v. Beverly Development Corporation*, 251 N. Y.

12, 166 N. E. 787, a statute somewhat similar to ours was construed as a statutory enactment of the preceding law.

■ Since all of the chattels which formed a part of the dryer were attached to the land in such a manner that they had become fixtures before the plaintiff accepted its mortgage, and since the plaintiff had no knowledge of the attempted reservation of title in the Puccinelli Company, it necessarily follows that the reservation of title was ineffective as to the plaintiff. Therefore, since the chattels had become fixtures and the alleged reservation of title was ineffective, it necessarily follows that the plaintiff's mortgage gave it a lien, not only upon the land but also upon the items with which we are now concerned.

■ We did not overlook the defendants' (appellants') contention that, since the plant was built under a contract which reserved title in the contractor, an absence of intention that the plant should become a fixture is indicated. But that provision was inserted for the contractor's benefit, not for that of the Kimballs'. Moreover, the latter surely intended to discharge the debt and make the plant a permanent accession to the land. But, most important, the law concerning fixtures ignores secret intentions of the kind entertained by the Kimballs, when the rights of innocent purchasers and mortgagees are determined.

There remains for consideration only the question as to whether or not the plaintiff became prevented in the manner alleged by the defendants from insisting upon the recovery of a judgment upon the note. It will be recalled that the defendants contend that the correspondence which the parties exchanged effected a contract which bound the plaintiff to accept a deed

to the property, and that they further contend that if the correspondence did not ripen into a contract the plaintiff's letters, together with the defendants' resulting conduct, estopped the plaintiff from insisting upon a judgment.

■ In our opinion, there are two reasons why neither a contract was effected nor an estoppel created. In the first place, we do not believe that the negotiations ripened into a contract. From § 25, Restatement of the Law, Contracts, we quote:

"If from a promise, or manifestation of intention, or from the circumstances existing at the time, the person to whom the promise or manifestation is addressed knows or has reason to know that the person making it does not intend it as an expression of his fixed purpose until he has given a further expression of assent, he has not made an offer."

This statement is followed by the following explanatory comment:

"It is often difficult to draw an exact line between offers and negotiations preliminary thereto. It is common for one who wishes to make a bargain to try to induce the other party to the intended transaction to make the definite offer, he himself suggesting with more or less definiteness the nature of the contract he is willing to enter into. Besides any direct language indicating an intent to defer the formation of a contract, the definiteness or indefiniteness of the words used in opening the negotiation must be considered, as well as the usages of business, and indeed all accompanying circumstances."

From Williston on Contracts, Rev. Ed., § 26, we quote:

"Since an offer must be a promise, a mere expression of intention or general willingness to do something on the happening of a particular event or in return for something to be received does not amount to an offer."

■ It will be recalled from the facts set forth in the preceding paragraphs that the parties conducted their negotiations by means of correspondence. It must be borne in mind that this is not an instance in which the parties were negotiating the purchase and sale of a parcel of property; both were endeavoring to work out a solution of a situation which had become the source of a great loss to the Kimballs and which the plaintiff apparently viewed as a possible source of loss to it also. The letters which Mr. Peters, on behalf of the plaintiff, and Mr. Cupper on behalf of the defendant, exchanged indicate that Peters did not know the condition of the Kimballs' title, and that Cupper, of course, did not know what documents the plaintiff would require before being willing to accept a deed. It developed at the trial, as we have already indicated, that no representative of the plaintiff had been upon the property for some years, and that the plaintiff was ignorant of the removal of the dryer plant. That being true, we must regard as important to the plaintiff any limitation with which it accompanied its expressions of willingness to accept a deed. The plan about a deed, to the extent that it was entertained by the plaintiff, was a disfavored alternative to which it reluctantly gave attention. If the plaintiff contracted to accept a deed we must find the written expression of its contract either in the letter of January 8 or that of March 16. Mr. Cupper's letter of January 8, 1937, cannot be deemed the expression of the purported contract, nor even of an offer later accepted because its offer of a deed—if that letter can be construed as an offer—was not accepted. Following the plaintiff's receipt of that letter more correspondence was exchanged in the course of which Peters made several suggestions which he

hoped the Kimballs would embrace, but which came to nothing. Therefore, if any contract to accept a deed was effected we must find it in Peters' letter of March 16. It will be recalled that in that letter Peters stated: "This arrangement is satisfactory providing such a procedure passes good title and is approved by our attorneys." Peters' expression "this arrangement" in all likelihood was not a chance remark, but was an indication of his understanding of the plan to be pursued. It was his way of expressing a general willingness to go ahead with the plan for the eventual delivery of a deed. The parties were not thinking in terms of contracting, but of working out of an unsatisfactory relationship. Peters' words, in our opinion, were "a mere expression of intention or general willingness," if we may employ the words of Williston which we have already quoted; or, reverting to the Restatement of the Law of Contracts, they were not "an expression of his fixed purpose" and required "a further expression of assent." In order to illustrate the reasons which have brought us to this opinion, we offer the suggestion that the Kimballs would certainly have felt greatly outraged if after their receipt of Peters' letter the plaintiff had tried to compel them to deliver a deed to the property had they, in the meantime, found a buyer willing to pay for the orchard a sum larger than the mortgage debt. We said that "a further expression of assent" was required, and thereby meant that the delivery of the deed, or at least its approval by the plaintiff's attorney, was required before each had become bound to the contemplated course of action. We are satisfied that the correspondence which the parties exchanged had not effected a contract whereby the one was bound to convey title and the other was

bound to accept the deed. We believe that this reasoning is in harmony with that employed in *Courteen Seed Co. v. Abraham*, 129 Or. 427, 275 P. 684, and in *Graef v. Bowles*, 119 Or. 498, 248 P. 1090.

■ We said in a preceding paragraph that two reasons had persuaded us that the defendants' contentions now under review are without merit. We have just stated the one; we shall now give the second. The parties were laboring under a mutual mistake when they planned the delivery of a deed in lieu of foreclosure. We are satisfied that the plaintiff's representatives knew nothing concerning the removal of the dryer plant, and are equally certain that Mr. Cupper, the defendants' attorney, was wholly unaware of what had taken place. The Kimballs had not lived upon the place for some years and no one claims that they were aware of Puccinelli's unlawful act. This mistake was material and was innocently made. If a contract was actually effected—and, as already stated, we are satisfied that none was—it was subject to rescission for the reasons just indicated: *Jackman v. Northwestern Trust Co.*, 87 Or. 209, 170 P. 304, and *McCrea v. Hinkson*, 65 Or. 132, 131 P. 1025. The plaintiff's refusal to accept the deed, which, as we have just seen, it had a right to reject, constituted the rescission.

■ The contention that the correspondence and the defendants' resulting conduct created an estopped *in pais* which prevented the plaintiff from obtaining judgment upon the note, we think, cannot be sustained. The representation—if Peters' letter can be so construed—was purely promissory; or, better stated, the purported representation expressed a willingness concerning a course of conduct which the parties contemplated. One essential of an estopped is that the repre-

sentation be made with knowledge of the essential facts; and another is that the party to whom it is made change his position while relying upon it. It is essential that he change his position to such an extent that he will be substantially prejudiced—not merely technically nor formally—if the other be relieved from his representations: *Bramwell v. Rowland*, 123 Or. 33, 261 P. 57, and *Security Sav. & T. Co. v. Portland Flour Mills Co.*, 124 Or. 276, 261 P. 432. As already indicated, the plaintiff was ignorant of the fact that the fixtures, which it believed would pass by the contemplated deed, had been removed from the property. The Kimballs' execution of the undelivered deed and their signatures to a formal affidavit concerning the property, at the plaintiff's request (likewise undelivered), imposed no prejudice upon them of the character demanded by the rule just mentioned.

The decree and judgment of the circuit court are affirmed.

KELLY, BAILEY and LUSK, JJ., concur.

RAND, C. J., and BEAN and BELT, JJ., not sitting.