Argued January 20, reversed August 12, 1953, argued on rehearing January 13, former opinion withdrawn; reversed and remanded July 13, petition for rehearing denied September 15, 1954

# START *v.* SHELL OIL COMPANY and ARNTSON

260 P. 2d 468
273 P. 2d 225

*Thaddeus W. Veness,* of Portland, argued the cause for appellant. With him on the briefs was Henry Bauer, of Portland.

*Wesley A. Franklin* argued the cause for respondent. On the brief were Anderson & Franklin, of Portland.

Before LATOURETTE, Chief Justice, and WARNER, LUSK, BRAND and PERRY, Justices.

WARNER, J.

This is an action for damages arising out of an alleged breach of warranty. The defendant C. Arntson appeals from a judgment in favor of plaintiff for $11,250, following a jury verdict.

The plaintiff Start at all the times hereinafter mentioned and for ten years prior thereto was a commercial grower of lily bulbs on his farm near Canby, Oregon, in an area which, according to Start, produces approximately 90 per cent of the Regal lily bulbs grown for commercial consumption in the United States. His enterprise, in the spring of 1948, included a seedling planting of two and one-half acres, which normally produced from three to four million Regal lily bulblets annually.

On February 16, 1948, the defendant Arntson, doing business in Portland, Oregon, as the Albina Sales Company and acting through his agent Kjome, sold plaintiff 200 gallons of a chemical prepared by Shell Oil Company and known under the tradename of "Shell Weed Killer No. 20." Start, sometime in April 1948, used the chemical to kill the weeds by spraying on the area where the bulblets were growing. He claims that as a result of a toxic condition created in the soil by the use of that specific chemical, his entire crop of bulblets for the year 1948 was ruined.

Start asserts that when he purchased the chemical, he relied upon the agent Kjome's specific representations that Shell Weed Killer No. 20 would destroy the weeds on his bulb farm but could be so used without danger of any damage or injury to his bulblets.

Arntson denies making any representations of that character to Start and, as a further defense, alleged that Start had long been in the business of growing lily bulbs for commercial trade and was fully informed

on the technical details of such enterprise, including matters relating to the elimination of weeds by spraying; that Arntson informed plaintiff that the weed killer in question was still in the experimental stage and that he could not tell in advance what might be the effect of the chemical when used to destroy weeds in fields where lily bulblets were growing. Arntson further sets out that Start on his own initiative had carried on experimental tests with this particular weed eradicator prior to its application to the weeds growing in the area where he was raising lily bulbs and had thereby determined from these tests, and without the assistance of the defendant, to rely and depend upon the same.

Shell Oil Company, the manufacturer of Shell Weed Killer No. 20, was originally impleaded as a defendant and in plaintiff's complaint was charged with a breach of an express warranty that the weed killer would not harm plaintiff's bulblets. It was later eliminated from the case by a motion for voluntary nonsuit.

In the interest of clarifying what is hereinafter said, we pause to observe that according to the record there are three different types of herbicides. They are: (1) a general weed eradicator which destroys all growing vegetation, weed or otherwise, with which it comes in contact; (2) a selective type which, when applied directly to growing vegetation, kills only certain weeds, leaving other plant life unimpaired (herbicides employed to rid lawns of dandelions exemplify weed destroyers of this type); and (3) a pre-emergent or pre-growth spray which is applied *after* the noxious growths have emerged from the ground and in sufficient time *before* a given commercial crop has revealed itself above the surface, thus insuring that the

crop will avoid contact with the chemical previously employed to destroy the weeds of the same area.

In these terms Start contends that he sought, and on Kjome's representations bought, what he believed to be a pre-emergent spray, whereas the defendant contends that the herbicide sold to plaintiff was, in fact, a general weed killer and was not otherwise represented or warranted and, being such, was the efficient cause of the damage to Start's crop of bulblets.

Prior to February 1948, Start, and apparently many of the bulb growers in his vicinity, had exterminated the weeds in the bulb gardens by burning or by manual extraction, or both, expensive processes as compared with the use of a pre-emergent spray, if practical. Although he had employed chemical products sold by defendant for other purposes, such as soil fumigants, he had not theretofore used a pre-emergent spray to rid his fields of weed pests. Indeed, the record discloses that the killing of weeds by use of a chemical pre-emergent spray was a relatively-recent innovation in the business of lily bulb growing for commercial purposes, and it was a subject approached by Start and his fellow growers with eager interest, coupled with a natural caution inspired by its very novelty.

We find that plaintiff was a member of the Regal Lily Growers Association, composed of about 40 bulb growers engaged in that industry in the environs of Canby, where the organization had its headquarters. He evidenced a lively interest in the organization's affairs and was instrumental in bringing to its meetings a Mr. Rieder, entomologist of Shell Oil Company's Portland division, to discuss expertly with the members questions which they might have with reference to the betterment of their bulb crops. Responsive to Start's request, Mr. Rieder appeared at a meeting of

the Regal lily growers held in Canby on November 11, 1947; and Start tells us that while at that meeting "there was some talk of weedkillers", that "pre-emergence spraying was mentioned" and "Shell's weedkiller" was discussed. Start discloses a knowledge of weed killers in terms of their distinctive functions, that is, whether they were selective, general or pre-emergent sprays. He knew that D-D, a Shell soil fumigant, was a poison but disclaimed knowing that Shell Weed Killer No. 20 had deadly ingredients. While he may not have been qualified to anticipate the character and extent of the damage he sustained, we are impressed by his own testimony that he knew enough concerning chemical weed killers generally and the prevailing uncertainty of their efficiency and latent dangers to put him on further inquiry before assuming the perils entailed in dealing with an agent making such spectacular claims for his principal's product as were made to him by Kjome. *Pokorny v. Williams*, decided by this court July 8, 1953; *Graef v. Bowles et al.*, 119 Or 498, 508, 248 P 1090; *Portland v. American Surety Co.*, 79 Or 38, 153 P 786, 154 P 121.

The defendant assigns as error the court's denial of his motions for a nonsuit and a directed verdict. Both motions are challenges to the sufficiency of the evidence.

The first and most important claim in this respect is that there is no evidence that Kjome, defendant's salesman, had authority, express or implied, to warrant that the weed killer sold to Start would not damage his growing bulbs. This was stated as a ground for defendant's motion for a nonsuit and again reiterated as supporting his motion for a directed verdict.

Plaintiff's assertion of warranty made by Arntson

through his agent Kjome rests upon his own testimony reading:

"* * * I asked Mr. Kjome at that time for a pre-emergence spray, what spray should I use, there were several that I had heard of but didn't know anything about and I asked Mr. Kjome what weedkiller to use, and he says No. 20. So I then asked Mr. Kjome if using that material on the soil above the bulbs which were sprouting below the soil if there were any possibility of a toxic condition developing that might injure the crop, and Mr. Kjome replied in these words, and I quote his exact words, I quote: 'There can be no toxicity because it is nothing but oil', unquote; and I repeat that those were Mr. Kjome's exact words. * * *"

The magnitude of such warranty is emphasized when we realize that, if truly made, the agent, in return for a sale of $40 to $50 worth of his principal's merchandise, thereby exposed his employer to a liability predicated upon the destruction of a potential $40,000 crop.

Arntson admits that Kjome was a salesman working for him, with authority to solicit orders for Shell Weed Killer No. 20 and other agricultural chemicals sold by defendant. He also admits that Kjome is the person who contacted the plaintiff Start. We are satisfied that in so acting, he was a general agent for Arntson (1 Restatement, Agency, § 3[1]), a fact which Start had a right to assume in the absence of information to the contrary. *Thomas v. Smith-Wagoner Co.,* 114 Or 69, 74, 234 P 814; *Rae v. Heilig Theatre Co.,* 94 Or 408, 413, 185 P 909. The defendant urges, however, that the extent of Kjome's authority is not a question of fact to be resolved by the jury alone but is one of law solely for determination by the court. In this the defendant is not correct. A more exact statement of the

law is found in 3 CJS, Agency, 328, § 330, reading: "Questions of fact to be determined by the jury or other trier of the facts include questions as to the nature and extent of the authority of an agent as to whether his authority comprehends the act or contract in controversy, unless the evidence is undisputed and not open to inferences or it conclusively shows lack of authority or is manifestly insufficient to show authority." Also see 2 Am Jur, Agency, 360, § 454; *Neppach v. Or. & Cal. R. R. Co.,* 46 Or 374, 391, 80 P 482. To the extent that *Clark v. Shea,* 130 Or 195, 205, 279 P 539, is in conflict with the true rule as expressed in 3 CJS, supra, it is expressly overruled. As more fully disclosed later in this opinion, the manifest insufficiency of evidence to show authority in Kjome renders the matter one of law for determination by the court. The court's denial of defendant's motions implies that it had found that such authority had been proved to its satisfaction.

■ Defendant argues that "A selling agent has no power to make any unusual warranties but has apparent authority only to make such warranties as are usual and customary in the trade."

In 2 Am Jur, Agency, 106, § 132, we find a comprehensive statement of the rules governing an agent's powers to make warranties binding on his principal:

"The rule advanced by a majority of the decisions, as well as by the American Law Institute, is, in substance, that the authority to sell a particular article includes the authority to warrant the title, quality, or condition of the thing sold if, and only if, such *warranty is usual or customary* in such a transaction, and is reasonably necessary to transact the business intrusted to the agent. Thus, a general selling agent has authority to give warranties as to the article sold *where such is the usage*

*of the business* in which he is employed and reasonably necessary to the transaction of the business intrusted to him * * *. It may be pointed out, however, that even a general selling agent has no authority to warrant articles sold if such is not the usage of the business in which he is employed. *Accordingly, in most cases the implied power of the agent to warrant is not made dependent upon whether he is a general or special agent, but upon the usages and customs of business. * * *"* (Italics ours.)

American Jurisprudence then proceeds to summarize well the foregoing statement into what we conceive to be the true rule:

"* * * The correct principle, briefly stated, is that an agent under an employment to make sales is impliedly authorized to employ only those means for the purpose usual to the business, and that the buyer cannot safely assume that he has authority to make any extraordinary guaranty or warranty, or one beyond the usage of the business in which the agent is employed."

Also see *Rector v. H. K. Mulford Co.,* (Mo), 185 SW 255; *Nixon Mining Drill Co. v. Burk et al.,* 132 Tenn 481, 178 SW 1116, LRA 1916C, 411; *Johns v. Jaycox,* 67 Wash 403, 121 P 854, 39 LRA NS 1151, Ann Cas 1913D, 471.

Our own pronouncements are in accord with the principle as stated in 2 Am Jur, Agency, 106, § 132. In *Reid v. Alaska Packing Co.,* 47 Or 215, 217, 83 P 139, this court, speaking through Mr. Justice ROBERT S. BEAN, held as follows:

"Webber & Co. had no authority to sell for defendant sockeye salmon, or to warrant that the quality of the fish which they agreed to sell to the plaintiff should be equal to the best Puget Sound Fancy Sockeye. They had nothing but a power to sell fish packed by the defendant company, and had

no authority to warrant that such fish should be of a quality not found in Alaskan waters or packed or handled by the defendant. *A mere selling agent, without express power to warrant, cannot give a warranty which will bind his principal, unless the sale is of a class which is ordinarily accompanied by a warranty * * *.*'' (Italics ours.)

Counsel for the plaintiff make no argument nor present any authority to the contrary. There is no evidence of or present claim that Kjome had express authority to make the representations which he did.

Before proceeding further to ascertain whether there is sufficient evidence that Arntson's agent was vested with implied authority to commit Arntson as plaintiff alleges he did, it is well to note first certain pertinent rules of law which must necessarily bear upon such inquiry.

■ At the outset we observe that it is a well-settled rule that one deals with the agent of a third party at his peril. In *Graef v. Bowles et al.,* supra, 119 Or 508, the court expressed itself as follows:

''It is a well-settled principle that one who deals with another as the agent of a third party does so at his peril. It is likewise a principle set forth in Portland v. American Surety Company, 79 Or. 38 (153 Pac. 786, 154 Pac. 121), cited by the plaintiff, that:

'' 'As to third persons, the principal is bound by the acts of his agent not only when executed in pursuance of actual authority, but also in the scope of his apparent authority arising from the manner in which his principal has held him out to the public. Apparent authority and its effect vanish, however, in the presence of actual knowledge of the third party as to the real scope of the agent's authority, or when the former has knowledge of facts which would put him upon inquiry as to the actual warrant of the agent.' ''

Also see *Pokorny v. Williams,* supra; *Finney v. Stanfield Frat. Assn.,* 131 Or 393, 399, 283 P 415; 3 CJS, Agency, 164, § 241.

The authority of an agent to bind his principal in contracts made with third persons is measured not only by the agent's express delegation of power but also by that which he is held out by the principal as possessing; provided, however, the third party had reason to believe and did believe that the agent was acting within and not exceeding his authority and such third party would sustain a loss if the contract was not regarded as a contract of the principal. *Nicholas v. Title & Trust Co.,* 79 Or 226, 238, 154 P 391, Ann Cas 1917A, 1149, and cases there cited; 2 Am Jur, Agency, 82, § 101.

■ The apparent authority for which the principal may be liable must be traceable to him and cannot be established solely by the acts or conduct of the agent. The principal is liable only for that appearance of authority caused by himself. 2 Am Jur, Agency, 85, § 103.

■ This court has heretofore defined the "apparent power" or "apparent authority" of an agent to conform with the definition given by Professor Mechem. In *Fine v. Harney Co. National Bank,* 181 Or 411, 464, 170 P2d 365, 182 P2d 379, 171 ALR 867, we said:

> "According to Professor Mechem, powers of an agent commonly referred to as 'apparent' are either (1) those which are incidental to the main authority conferred because that is the regular and ordinary way of doing business, or (2) those which are 'sought to be deduced from special circumstances of recognition, acquiescence or holding out', as to which 'the principle of estoppel or something akin to it at least, must be invoked'. 1 Mechem on Agency

509-513, §§ 720-726. In the latter class of cases the author says:

"'* * * it is obvious that the doctrine can apply only in those cases in which (the) element of reliance was present. It can therefore apply only to cases in which credit has been extended, action has been induced, delay has been obtained, or some other change of position has occurred, in reliance upon the appearance of authority * * *' Ibid. 512, § 724."

Here we have but one element of the agent's authority to determine: Is there substantial evidence that Kjome, as a general agent, had apparent authority sufficiently broad from whence it might be implied that he had power to warrant that the weed killer would create no toxicity harmful to plaintiff's growing bulbs?

In the discovery of a proper answer to that question, it should be remembered that the burden is upon the plaintiff to show that the agent had such an authority. *Jones v. Marshall-Wells Co.*, 104 Or 388, 394, 208 P 768; 2 Am Jur, Agency, 349, § 442; 3 CJS, Agency, 257, § 317. Circumstantial evidence is ordinarily competent to establish its extent. *Pokormy v. Williams*, supra; *Bailey v. Opp*, 159 Or 301, 312, 77 P2d, 826, 80 P2d 40.

Plaintiff failed to adduce one iota of testimony from which it might be inferred that Kjome's representations could be implied as an incident of his apparent powers of agency, that is, "those which are incidental to the main authority conferred because that is the regular and ordinary way of doing business". Nor, indeed, is there any evidence of special circumstances of recognition, acquiescence or holding out on the part of Arntson warranting a deduction of such power as to which the principle of estoppel, or something akin to it, at least, must be invoked. *Fine v.*

*Harney Co. National Bank,* supra, 181 Or 464. To the contrary, it is established by plaintiff's testimony that he never had any personal dealings with the defendant, whose place of business was approximately 25 miles from Start's operations and of relatively easy contact. The most that can be claimed by plaintiff as to Kjome's apparent authority is that he was a salesman for Arntson, engaged in the sale of products merchandised by him. Even before Start made his purchase through Kjome, he knew that some of his neighbors had had varying results with chemical weed killers and that the use of pre-emergent sprays was a novelty in the bulb business; and although he had no information upon which to predicate an assumption that Kjome spoke as an expert in making the representations upon which Start relied, he, nevertheless, made no effort to determine whether Kjome spoke either as one skilled on the subject of pre-emergent herbicides or was authorized to so speak with express or implied authority to commit his employer to the extent that he did. Certainly he was in no position to assume that the giving of such a warranty under the circumstances was usual or customary to the usages and customs of the class of business in which Kjome was engaged in February 1948.

We conclude that in the absence of proof of express authority, the plaintiff has failed to sustain the burden of offering any evidence from whence it might be reasonably inferred that it was either usual or customary, in the sale of a herbicide of the class of which Shell Weed Killer No. 20 is a part, for a salesman to make a warranty binding on his principal of the kind and character made by Kjome to Start. It appeals to us as contrary to the established law of agency, as well as extremely dangerous to the commercial world, to

hold that a salesman, not shown to have any apparent or express authority other than that of taking orders for a chemical of powerful toxic content, has implied authority to make a warranty of such far-reaching import as plaintiff claims was made to him and thus expose his principal to liability for damages to the extent sought here.

It follows that the order denying defendant's motion for a directed verdict should be reversed.

### On Rehearing

James R. Bain, Judge.

*Thaddeus W. Veness,* of Portland, argued the cause for appellant. With him on the briefs was Henry Bauer, of Portland.

*Wesley A. Franklin* argued the cause for respondent. On the briefs were Anderson, Franklin & Landye, of Portland.

Before Latourette, Chief Justice, and Warner, Rossman, Lusk, Brand and Perry, Justices.

LUSK, J.

This action arose out of the sale in February, 1948, by the defendant, C. Arntson, through his sales agent Kjome, to the plaintiff of a chemical manufactured by Shell Oil Company bearing the trade name "Shell Weed Killer No. 20". Plaintiff sued for damages for breach of warranty alleged to have been given by the salesman. The second amended complaint on which the case was tried alleged that the defendant "specifically represented to plaintiff herein that said weed

killer would destroy the weeds in the plaintiff's bulb farm, but would not in any way damage or injure the plaintiff's bulblets.'' In a trial by jury plaintiff recovered a judgment from which Arntson, hereinafter referred to as the defendant, has appealed. Shell Oil Company was also a party defendant, but plaintiff took a voluntary nonsuit as to it. By our former opinion we reversed the judgment for plaintiff. We held that the Circuit Court erred in denying defendant's motion for a directed verdict for the reason that the salesman was without authority to give the warranty which constitutes the basis of the action.

Plaintiff grows Regal lily bulbs for commercial purposes on a farm near Canby, Oregon. He desired to obtain and use on his farm a so-called pre-emergence spray for destroying weeds, that is, a spray which is applied to the field after the crop has been planted, but before it has emerged, and after the weeds have appeared upon the surface. Plaintiff discussed the matter with Kjome, who had called on him in his capacity as a salesman of Shell Weed Killer No. 20 for defendant, and, according to the plaintiff's testimony, Kjome recommended Shell Weed Killer No. 20 as suitable for the plaintiff's purpose. Plaintiff's testimony as to the warranty is as follows:

"* * * I asked Mr. Kjome at that time for a pre-emergence spray, what spray should I use, there were several that I had heard of but didn't know anything about and I asked Mr. Kjome what weed killer to use, and he says No. 20. So I then asked Mr. Kjome if using that material on the soil above the bulbs which were sprouting below the soil if there were any possibility of a toxic condition developing that might injure the crop, and Mr. Kjome replied in these words, and I quote his

exact words, I quote: 'There can be no toxicity because it is nothing but oil', unquote; and I repeat that those were Mr. Kjome's exact words. * * * ''

■ Relying, as he testified, upon Kjome's representation, plaintiff purchased a large quantity of the weed killer and applied it to the ground above the sprouting bulbs. The evidence justifies a finding that as a result a taxic condition of the soil was created and the bulb crop thereby ruined. By his motion for a directed verdict, the denial of which is assigned as error, defendant raised the question now to be considered, namely, whether there is substantial evidence in the record that the salesman, Kjome, had either express or implied authority to make the representation to which the plaintiff testified.

■ It is conceded that there is no evidence of express authority. Upon the question of implied authority the rule applicable to the facts of this case is thus stated in A.L.I. Restatement, Agency § 63 (2):

"Unless otherwise agreed, authority to sell includes authority to make such, and only such, representations as the agent reasonably believes to be true and as are usual with reference to such a subject matter or, in the absence of usage, *representations concerning qualities of the subject matter which, at the time, are not open to inspection and as to which the principal has reason to know the buyer will desire to be informed.*" (Italics added.)

■ Cases applying the principle stated in the language which we have italicized are *Distillers Distributing Corp v. Sherwood Distilling Co.*, (CA 4th) 180 F 2d 800 (opinion by Parker, Chief Judge); *Miller v. Economy Hog & Cattle Powder Co.*, 228 Ia 626, 293 NW 4; *Conkling v. Standard Oil Co.*, 138 Ia 596, 116 NW 822;

*Park v. Moorman Mfg. Co.*, (Utah) 241 P2d 914. There is no evidence of usage in this case, and there could have been none, because, as is said in defendant's brief, "insufficient time had elapsed in the history of Weed Killer No. 20 for any type of customary warranty to be developed." Under the evidence, however, the jury could have found that the defendant had reason to know that a buyer in the plaintiff's situation would be likely to inquire whether a pre-emergence spray, applied to the soil for the purpose of killing the weeds on his lily farm, would also destroy the growing crop under the soil, and therefore that the agent had the authority to give plaintiff the assurances to which plaintiff testified and without which, in all probability, no sale would have been made. We think that a reasonable man might say that it would not be unusual or extraordinary for a buyer to evince curiosity as to that subject.

The defendant relies on *Reid v. Alaska Packing Co.*, 47 Or 215, 83 P 139, where we held that an agent for the sale of salmon packed in Alaska had no authority to represent that "the fish would be exactly like that of Puget Sound Fancy Sockeye." We said:

> "They [the agents] had nothing but a power to sell fish packed by the defendant company, and had no authority to warrant that such fish should be of a quality not found in Alaskan waters or packed or handled by the defendant. A mere selling agent, without express power to warrant, cannot give a warranty which will bind his principal, unless the sale is of a class which is ordinarily accompanied by a warranty".

A mere statement of the facts of that case reveals clearly a distinction from the present case. Selling salmon was certainly not a new enterprise, and if there

had been any custom to give warranties of the kind which the agents gave, testimony to that effect could have been introduced. Beyond that, it would be unreasonable to argue that the principal in the Reid case had any reason to know or to assume that the buyer would desire information of the kind contained in the warranty.

■ We cannot say as matter of law that the warranty sued upon in this case was either unusual or extraordinary or could not be found by the jury to be within the authority of the defendant's agent. Moreover, as will be shown later in this opinion, an equivalent warranty under the facts of this case would arise by operation of law, and "a selling agent has power incidental to his main authority to give an express warranty which is identical in purport and substance therewith." 2 CJS 1334, Agency § 115.

■ Other grounds assigned in support of the motion for a directed verdict are without merit. The question whether plaintiff relied on the knowledge, skill or special information of the salesman was clearly for the jury to decide. One ground of the motion was that the evidence was not sufficient to prove the *amount* of plaintiff's damages. The brief of the defendant does not urge this contention. Instead, it argues that the evidence that the weed killer, and not the negligent or improper use thereof by plaintiff, caused the damage, is speculative and conjectural and therefore insufficient. This is a question of proximate cause not raised by the motion for a directed verdict, and consequently one which cannot be raised on appeal. The same thing is true of the contention in the brief that the plaintiff failed to give timely notice of the breach of warranty as required by ORS 75.490. This objection is not included among the grounds of the motion for

a directed verdict. .Aside, however, from these procedural obstacles, our examination of the record convinces us that all the contentions raised in this court by the defendant in support of the motion for a directed verdict relate to questions concerning which there is conflict in the testimony and which, therefore, were properly submitted to the jury.

■ Defendant's Assignment of Error No. IV is directed to a ruling of the court which withdrew from the consideration of the jury a mimeographed circular regarding Shell Weed Killer Nos. 12 and 20 and which had theretofore been admitted in evidence over the objection of counsel for plaintiff. The information contained in the circular, if brought home to plaintiff before the sale, was material as tending to negative plaintiff's claim of reliance on the alleged warranty. Plaintiff, on his cross-examination, had denied that he had knowledge of the contents of the circular until July, 1948, which was several months after he had purchased and used Shell Weed Killer No. 20. The correctness of the ruling depends on whether there is substantial evidence that plaintiff received the circular in the summer of 1947.

On June 9, 1947, plaintiff wrote to Mr. Robert Reider, an agricultural technologist in the employ of Shell Oil Company, Inc. at Portland, Oregon, asking for information and literature about Shell soil disinfectants for the destruction of bulb pests. Mr. Reider answered him by letter dated June 17, 1947, which was devoted for the most part to a discussion of a Shell product called D-D for the elimination of pests. The concluding paragraph of the letter is as follows:

"I am enclosing several printed circulars and *mimeographed reports concerning the usage of D-D for soil pests.* Thought you might possibly be

interested in new weed killers which we are now marketing, Shell Weed Killers Nos. 10 and 20, and have enclosed a *mimeograph letter giving some information about them."* (Italics added.)

Under date of June 26, 1947, the plaintiff wrote Mr. Reider a letter which, so far as material, reads:

"Will you kindly send me about thirty sets of literature on Shell DD including same items that I received last week.

"One green garden pamphlet, yellow booklet and *mimeographed data.* These are intended for distribution to growers at a forthcoming meeting." (Italics added.)

Reider's office copy of his letter of June 17, 1947, was received in evidence without objection. As a witness for the defendant Reider testified that a circular consisting of four mimeographed sheets on the subject of Shell Weed Killer Nos. 10 and 20 was enclosed with his letter, and he identified a circular shown to him as a copy of that enclosure. Counsel for plaintiff objected to the admission in evidence of the circular, stating that such a circular had not been received by the plaintiff and that he had no such circular in his possession. The court overruled the objection.

On cross-examination Reider testified that he dictated his letter of June 17, 1947, to his stenographer; that he had the circulars in the file and gave them to her when he finished the dictation; that after the stenographer typed the letter he signed it and gave it back to her to mail; that the circular on the subject of Shell weed killers was the only one ever gotten out by the company; that he did not watch his stenographer enclose the circulars with the letter and had no personal knowledge that they were enclosed though "he had never known her to fail yet." The plaintiff

admitted on rebuttal that he received Reider's letter of June 17, 1947; that he received a "big heavy envelope full of bright orange and green pamphlets"; but, in answer to the question whether he received the mimeographed circular relating to weed killers, he answered, "I don't think I ever did", and he also could not recall ever having read the circular. He further testified that on the previous day he had made a search of his files and could not find Reider's letter of June 17, 1947.

After plaintiff's testimony on this subject the court, on motion of counsel for plaintiff, struck the circular relating to Shell weed killers from the evidence and instructed the jury to disregard it.

It is contended by the defendant that plaintiff's letter of June 26, 1947, is an acknowledgment of the receipt of the circular on weed killers. We do not think that it can be fairly so construed. By that letter plaintiff requested thirty sets of literature "on Shell DD" which were to include the "same items that I received last week", that is, with Reider's letter of June 17, 1947. He then specified as the items "one green garden pamphlet, yellow booklet and mimeographed data." It is undisputed that the green garden pamphlet and the yellow booklet related to D-D and not to weed killer. In this context the only reasonable interpretation is that by "mimeographed data" the plaintiff meant "mimeographed reports concerning the use of D-D" referred to and enclosed with Reider's letter and not "a mimeographed letter giving some information" about Shell Weed Killer Nos. 10 and 20, to which Reider's letter referred and which he wrote he also enclosed.

It remains to consider whether the other evidence on the question was sufficient to constitute a prima

facie showing of receipt of the Shell weed killer by plaintiff. The testimony of Mr. Reider, while not as explicit as it might have been, nevertheless was evidence of the practice that he pursued in such matters. After stating what he did in the particular instance, he said on cross-examination that he did not watch his stenographer put the circulars in the envelope, and, in answer to the question, "Do you have any personal knowledge that anything was ever enclosed in the letter?" he answered, "I have never known her [the steongrapher] to fail yet." This can mean nothing else than that he had followed his customary practice of instructing the stenographer to enclose material with letters which he dictated to her and which referred to such enclosures, and that she had always followed his instructions. He also testified to the practice about mailing letters. When questioned about that he said, "I don't mail letters", and that the stenographer mailed the letter in question. His testimony was given three and one-half years after the event, and it may be safely assumed that he had no more personal knowledge as to whether the stenographer mailed this letter than he had about the fact of her enclosing the circulars. He must have testified that she mailed the letter because that was one of her duties. We know that she discharged that duty, that the letter was mailed, and that some of the material that she was instructed to enclose was enclosed and was received by the plaintiff. On this record we think it a reasonable inference that the stenographer, in addition to mailing the letter and enclosing the material which related to D-D, discharged the remainder of her duty and enclosed the circular on Shell Weed Killer Nos. 10 and 20. If she did then plaintiff received it.

█ Under our law there is a disputable presump-

tion that ''The ordinary course of business has been followed.'' ORS 41.360 (20).

Professor Wigmore discusses a particular application of this presumption under the caption ''Habit or Custom'' and has the following to say about the course of the mail and telegram:

> ''The fixed methods and systematic operation of the *Government's postal service* have been long conceded to be evidence of the due delivery to the addressee of mail matter placed for that purpose in the custody of the authorities. The conditions are that the mail matter shall appear to have conformed to the chief regulations of the service, namely, that it shall have been sufficiently prepaid in stamps, correctly addressed, and placed in the appropriate receptacle.

> ''The habit of a *commercial house,* maintaining systematically a mailing or other transmission service, is equally relevant. The principle has been applied to an *express company's* delivery of packages and to a *telegraph company's* transmission of telegrams. The same application of the principle would admit any person's usual course of *business practice* to evidence *any act of delivery or transmission,* such as the sending of a notice, or the placing of letters in the mailbox; the only differences are, first, that the fact of the governmental system will be judicially noticed without further evidence * * * and secondly, that the course of business of an individual may under the circumstances not appear sufficiently fixed to be of probative value. A consequence of the combination of these two applications of the principle is that, upon proper evidence of the habit of an individual commercial house as to addressing and mailing, the
> ed) 524 § 95.
> mere *execution of a letter* in the usual course of
> by the addressee.'' 1 Wigmore on Evidence (3d
> business may be evidence of its subsequent receipt

Numerous cases are cited in the notes, some supporting and some contrary to the text. The strict exclusionary rule adhered to by some courts is disapproved by the eminent author, who says of such a ruling in *Federal Asbestos Co. v. Zimmermann,* 171 Wis 594, 177 NW 881:

> "* * * this type of ruling is finical and unpractical; it brings the law into distrust among business men, who not only rely upon such evidence but know that it often represents the most that is honestly obtainable; standards of probative value in court must have some fair relation to standards accepted outside." (Op. cit. p. 527, note.)

We will refer to some of the cases which apply what we conceive to be the more useful and enlightened rule. In *Dana v. Kemble,* 36 Mass 112, the question was whether the defendant, a guest at the Tremont house in Boston, received letters addressed to him there. The letters were left at the bar of the hotel. The barkeeper testified that it was the invariable usage of the house to deposit all letters left at the bar in an urn kept for that purpose since they were distributed almost every fifteen minutes throughout the day to the rooms of the guest to whom they were directed; that a great number of letters were left there every day for the boarders of the house; and that he had never known any case in which a letter so deposited had not reached the person to whom it was addressed. The court, speaking through Chief Justice Shaw, stated:

> "* * * In this case we are satisfied, that there was evidence amply sufficient, of original letters having been delivered, to let in secondary evidence. The evidence, that a letter left at the Tremont house and addressed to Kemble actually reached him, is of the same nature as a similar

presumption arising from putting a letter so addressed into the post office, and may even be considered as considerably stronger, inasmuch as there would be less probability of a failure.''

·In *Weinstein v. Miller*, 249 Mass 516, 144 NE 387, the court seems to have assumed, though it did not actually decide, that the testimony of the author of a letter that ''We have a box on the desk and all letters going today is put there; and my bookkeeper mails them before she goes home'' was sufficient proof of mailing. In *Prudential Trust Company v. Hayes*, 247 Mass 311, 142 NE 73, a witness testified that he dictated a letter, that he signed it in accordance with his invariable practice, and that, while he did not know if it was actually mailed, he gave it to a clerk to mail, she being the ''mailing clerk''. The court held that copies of the letter in question and of others as to which similar testimony was given were properly received. The court said:

''The case at bar is a close one. But in large banks and business houses, it must often be practically impossible to honestly obtain more definite evidence as to mailing than the delivery of letters to the mailing clerk, whose duty it is to deposit them in the post office in the usual course of his employment. A mere statement by such clerk that he invariably posted all letters entrusted to him would probably be an inference on his part, rather than a matter of memory, and in any event would be cumulative. See Wigmore on Ev (2d ed.) 330, 331. Norway Plains Co. v. Boston & Maine Railroad, 1 Gray, 263, 267, 268. See also Green v. Crapo, 181 Mass. 55, 63. On the facts shown in this record, including the admitted receipt by the defendant of two letters, and the proof that all letters were delivered to the clerk who in the ordinary course of the bank's business mailed them, in the opinion of a majority of the court it was not reversible

error to admit the copies in evidence, after due notice had been served on the defendant to produce all correspondence in relation to the subject matter.''

In *Ennis-Baynard Petroleum Co. v. Plainville Mill and Elevator Co.*, 118 Kan 202, 235 P 119, the testimony of the president and bookkeeper of a corporation that a letter containing a check was handled as the defendant's mail was usually handled, that is, it was put in the general bunch of mail ready to go to the post office, was held to be sufficient. The court said:

''* * * when the defendant's usual course of mailing its correspondence was shown and when the letter of transmittal with the check inclosed was shown to have been thus handled in the usual course of business, the affixing of adequate postage was implied (Estes Mills Co. v. Stewart A. Shannon Co., 81 Pa Sup. Ct. 536), and there was sufficient evidence to justify a jury's finding that the letter had been received in due course of mail.''

These cases, of course, relate to the mailing of letters. The question here is whether a circular consisting of four mimeographed pages and containing information about a product of the Shell Oil Company, which the author of the letter, in the course of his duties as an employee of that company, desired to bring to the attention of a prospective customer, which he said in his dictated letter he had enclosed and which, in accordance with his usual custom he handed to his stenographer and instructed her to enclose, was received by the addressee of the letter, who concededly received the letter and other material therein referred to. The analogy to the cases cited is fairly complete; the inference fully as strong. It is no objection that the evidence of practice was not more explicit and detailed, for a court might almost take judicial notice

that it is the common practice in every large commercial house. The evidence that the practice was uniformly followed is substantial. The showing was sufficient to permit admission in evidence of a copy of the circular. The jury should have been permitted to consider it along with the plaintiff's denial that he had received the circular and to determine the fact. Allowance of the plaintiff's motion to strike the evidence from the record constituted reversible error.

The court instructed the jury on implied warranty and the defendant excepted on the following grounds: that implied warranty was not pleaded or proved, the complaint being based on express warranty, and that the product was sold under a trade name and that the instruction ignored that fact.

Defendant assigns error to the giving of the instruction and argues at length that the complaint does not charge breach of an implied warranty. The record discloses that when the pleadings were being made up before another judge than the judge who presided at the trial, the court, on motion of defendant, struck from the complaint the allegation that defendant "breached the warranty of fitness for a particular purpose". This was in addition to the allegation that the defendant breached the express warranty pleaded. The ground of the ruling does not appear. Whatever it may have been, the plaintiff, in compliance with the order, filed an amended complaint which omitted the stricken allegation, thus leaving him with a pleading which, in terms at least, charged defendant with breach of an express warranty only. Thus, the way was left open for a claim that the second amended complaint on which the case was tried fails to show even that plaintiff *intended* to charge breach of implied warranty. The question whether this complaint alleges

sufficient facts to raise the issue of implied warranty is a close one. We need not decide it, however. There is evidence that the plaintiff made known to the defendant's agent the particular purpose for which Shell Weed Killer No. 20 was required, and that he relied on the agent's skill or judgment. Therefore the jury could have found an implied warranty that the product was reasonably fit for such purpose. In view of this state of the record, and, since the case must be retried, the plaintiff should be permitted to amend his complaint so as to conform to the evidence and the requirements of the statute, thus removing any doubts that there may be about the sufficiency of the present pleading.

ORS 75.150 (1) provides:

"Where the buyer, expressly or by implication, makes known to the seller that particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose."

But defendant urges that, since the product was sold under a trade name the case is controlled by ORS 75.150 (4), which reads:

"In the case of a contract to sell or a sale of a specified article under its patent or other trade name, there is no implied warranty as to its fitness for any particular purpose."

The contention is foreclosed by *Sperry Flour Co. v. De Moss,* 141 Or 440, 443, 18 P2d 242, 90 ALR 406, and *Campbell v. Corley,* 140 Or 462, 474, 475, 3 P2d 776, 13 P2d 610, 14 P2d 455. The rule approved by these decisions is as follows:

"If the circumstances of the transaction show that the buyer made known to the vendor the pur-

poses for which he desired the article, relied upon the seller's skill and judgment, and that the trade-name was inserted in the contract merely for the convenience of description, an implied warranty of fitness arises for the protection of the buyer, in the absence of a clause of disclaimer, even in juris-dictions where the Uniform Sales Act has been adopted.''

See, also, 90 ALR 412; 59 ALR 1186, 1187.

While the orders specified ''Shell Weed Killer No. 20'', Start's testimony is in substance that he asked the salesman Kjome what he should use as a pre-emergence spray which would kill the weeds before the cultivated crop came up through the ground, and that Kjome recommended Shell Weed Killer No. 20. From this and other evidence in the case the jury could have found that Start relied on the skill and judgment of the seller and not on the trade name. The evidence brings this case within the rule of our decisions above cited. If the facts are as the plaintiff claims, then the law would imply a warranty that, since the defendant knew the purpose for which the plain-tiff was buying the weed killer, its use in the manner contemplated would not injure the plaintiff's crop. Otherwise, the weed killer would not be reasonably fit for that purpose. 1 Williston on Sales (Rev ed) § 235.

The ground of the exception to the instruction on implied warranty, that it ignored the fact that the product was sold under a trade name, need be given no further notice than to state that the court did give a proper instruction upon this subject.

The court instructed the jury on agency by estoppel, and defendant excepted and assigns the giving of the instruction as error. That part of the instruction

which would have authorized the jury to find that defendant was estopped to deny that Kjome was his agent is abstract because the fact of agency was admitted; the remainder was erroneous. It reads:

> "Therefore, in this case if the defendant Arntson knowingly caused or permitted John Kjome to appear and act as his employee and agent to the detriment of plaintiff Start, or accepted the benefits of any contracts or dealings between Kjome, as his agent, and plaintiff Start, then and under such circumstances the defendant Arntson cannot be heard to deny that Kjome was his agent *and is bound by such representations as you may find from the evidence that Kjome made in the course of such dealings.*" (Italics added.)

■ Estoppel to deny Kjome's authority to give the warranty sued on is not involved, for there is no evidence that defendant accepted the benefits of the contract with knowledge that the representation had been made. Even though there had been such evidence the instruction was faulty because it would have permitted the jury to find that defendant was estopped to deny that the agent had the disputed authority without finding that defendant knew of the representation at the time he accepted the benefits of the contract. This is not the law, since, if the acts of the agents are relied on, "there must also be evidence of the principal's knowledge of and acquiescence in them." 1 Mechem on Agency (2d ed) 513 § 725. On another trial no instruction on agency by estoppel should be given.

■■ The final assignment of error challenges a ruling of the court which excluded evidence relating to damages offered by defendant. The court's instructions respecting the measure of damage are not criticized, but it is contended that the evidence excluded by the ruling is material on the question of market value of

Regal lily bulblets in the 1948-1949 season. Such market value, it is agreed by the parties, is a factor entering into the measure of damages in a case like this. See *Walter v. Echanis*, 163 Or 148, 95 P2d 979; *Laur v. Walla Walla Irrigation Co.*, 118 Or 520, 529, 247 P 753; *Hall v. Brown*, 102 Or 389, 396, 202 P 719; annotation 175 ALR 159. A qualified witness for the plaintiff testified that the market value of Regal lily bulblets in the 1948-1949 season was $15 a thousand, and a qualified witness for the defendant testified that it was $10 to $15 a thousand. The excluded proof, which the defendant proposed to make by his witness on market value, would have tended to impeach the very opinion which the witness himself had given in that regard and would have introduced an element of speculation into the case that could not have been other than a source of confusion to the jury in their deliberations upon the amount of the plaintiff's damages. There was no error in the ruling.

Our former opinion is withdrawn, and the judgment is reversed and the cause remanded for further proceedings in conformity to this opinion.