Argued and submitted January 18, reversed and remanded November 14, 1985

REAL ESTATE LOAN FUND OREG. LTD.,
*Appellant,*

*v.*

HEVNER et al,
*Defendants,*

ASSOCIATION OF UNIT OWNERS OF BAYSHORE INN,
*Respondent.*

(47695; CA A31647)

709 P2d 727

Kathleen A. Evans, Salem, argued the cause and filed the brief for appellant.

Taisto Pesola, Salem, argued the cause for respondent.

With him on the brief was Michael S. McLaughlin, Certified Law Student, Salem.

Before Gillette, Presiding Judge, and Van Hoomissen and Young, Judges.

VAN HOOMISSEN, J.

## VAN HOOMISSEN, J.

Real Estate Loan Fund (RELF), a limited partnership, filed a complaint for strict foreclosure of a land sale contract against defendants Fast and Hevner,[1] owners of a condominium unit. RELF joined as a defendant the Association of Unit Owners of Bayshore Inn (the Association), which claimed a lien on the unit. The Association cross-claimed for foreclosure of its assessment lien on the unit, claiming a priority. *See* ORS 94.195. In reply, RELF claimed that it had priority over the Association's lien. RELF alleged that the Association had entered into a contract with RELF to release its liens, so as to permit RELF to foreclose or to accept deeds in lieu of foreclosure where contracts for condominium units were in default, and that the Association was estopped to deny that contract. The trial court found that there was no contract between RELF and the Association, that the Association was not estopped to assert its priority and that the Association's lien had priority. On *de novo* review, we reverse.

In 1977, Brenneman, then the owner of a motel known as the Bayshore Inn, converted it to condominiums. An association of unit owners was formed. RELF was involved in the formation of the Association and approved its by-laws. *See* ORS 94.004 *et seq*. Brenneman sold some of the condominium units on land sale contracts. He later sold sixty of those contracts to RELF. By 1981, RELF was having trouble collecting on some of the contracts. RELF was aware that the Association had filed liens for nonpayment of assessments against some of the units in which RELF had an interest. The Association's aggregate assessments against the units on which RELF had contracts totaled more than $90,000.

In order to avoid a judicial foreclosure of each unit and the necessity of litigating priority between itself and the Association, RELF and MBC, RELF's general partner, wanted the Association to release its priority lien claims against the units on which RELF held a contract. That would

---

[1] An order of default was entered on RELF's case against the Fasts, and an order of partial summary judgment was entered on RELF's case against the Hevners. The Fasts and Hevners are not parties to this appeal. A trial to the court was held on the issue of priority and release of the Association's liens; a judgment was entered granting RELF's foreclosure, subject to the Association's liens of $2,636.24, and ordering foreclosure of those liens and sale of the unit.

allow RELF to accept deeds in lieu of judicial foreclosure. RELF asked Holmes, an attorney who had represented both parties in the past and who was then the Association's registered agent, to convey RELF's offer to the Association. On February 17, 1982, he wrote to the Association:

"S. E. Brenneman, Manager
Association of Unit Owners
The Bayshore Inn
500 Bayshore Drive
Waldport, Oregon 97394

"Re: Bayshore Inn Assessments/ Mortgage Bancorporation Lien Priorities

"Dear Ed:

"I would appreciate your presenting this letter to the Board. Mortgage Bancorporation has a number of contracts to foreclose upon. They claim a priority of their lien as being ahead of the assessments made by the Association. As you know, the Court has agreed with that and have (sic) given then (sic) a prior lien in the only case brought to issue.[2] In many instances they can obtain a deed in lieu of foreclosure and could avoid the time, expense and delay of foreclosing if the Board would release the unit they intend to foreclose from the assessment. In order to eliminate the joining of the association in each lawsuit, Mortgage Bancorporation [RELF's general partner] would offer to do the following:

"(1) Pay the Association $100 for a release of the lien as to the property being foreclosed or deed taken in lieu with the understanding that that assessment can still be collected by the association from the individual against whom the foreclosure action is brought or whoever may own it; and

"(2) During the foreclosure proceedings and until the unit is sold to a third party, who would become a member of the association, the association would be free to rent the unit and retain all the proceeds so long as no continuing assessments or costs were charged Mortgage Bancorporation.

"I would appreciate your response to this at your earliest convenience. Thank you kindly.

"Very truly yours,

"/s/ Kenneth A. Holmes"

---

[2]One unit was judicially foreclosed. The Association defaulted in that case, and judgment was entered for RELF.

Holmes' letter was received by Brenneman, who at that time was the Association's manager.

A special meeting of the Association was held on February 27, 1982, at which all members of the Association's Board of Directors were present. The minutes of that meeting show that Holmes' letter was read and discussed. The letter, which is included verbatim in the minutes of the meeting, is followed by a notation, "Decision made to comply with request." Immediately following the special meeting, the Association's Board of Directors met. The minutes of the Board of Directors' meeting do not mention Holmes' letter or RELF's proposal.

On March 2, 1982, Holmes received a letter from Brenneman on the Association's stationery. It stated, in relevant part:

"The members of the Board of the Association of Unit Owners unanimously agreed to the proposal of February 17 to accept the terms for the release of liens on properties to be foreclosed or deed taken in lieu of foreclosure in favor of Mortgage Bancorporation.

"I will send you a copy of the minutes as soon as possible."[3]

At the Board of Directors' meeting on March 13, 1982, the minutes of the February 27 Association meeting were "read and approved." After receiving Brenneman's March 2 letter, RELF suspended foreclosure and collection activity on the delinquent units. RELF sent release documents to the Association, but they were not returned. After subsequent negotiations failed to resolve the dispute between the parties, this foreclosure action resulted.

The trial court stated:

"After reviewing the facts in this case and the exhibits, the Court is of the opinion and will hold that the plaintiff has failed in [its] burden to establish that the defendant Association entered into an agreement whereby they would subordinate their assessments to the plaintiff's interest. The plaintiff was aware that the Association acted through its board of directors both because it originally examined the prospectives [sic] for the condominiums and because it held one or more of the condominium units and it received the information from

---

[3] The promised copy of the minutes was not sent.

the Association concerning the assessments and the meeting of the Unit Holders as well as the Board of Directors. The plaintiff did desire to avoid to have to foreclose each of the contracts individually and did attempt to negotiate through Ed Brenneman and Kenneth Holmes to remove the assessments from their foreclosure proceedings, however, the Court finds that there was never an agreement consummated between the Board of Directors for the Association, as required under the Association's bylaws, and the plaintiff. From the evidence it appears that some of the unit owners did agree to this procedure, however, it was never formally acted upon by the Board of Directors, and therefore there was no agreement. The plaintiff having dealt in real estate transactions for a period of time had the knowledge that it needed formal board action and never formally presented an agreement to the Board of Directors for their approval. Rather the plaintiff relied upon what the Court finds from the evidence to be informal negotiations and felt they had an agreement, but the Court finds they had no basis to rely. Ed Brenneman did not speak on behalf of the Board of the Association and there is nothing in the evidence that would indicate that he did have such authority. The Court further finds that there is no basis to establish estoppel against the Association and therefore will not estop the Association from asserting its lien."

RELF assigns as error the trial court's conclusion that the Association's lien had priority. RELF argues that a binding contract was formed between RELF and the Association.

■     Oregon subscribes to the objective theory of contract. In determining whether a contract exists and what its terms are, we examine the objective manifestations of intent, as evidenced by the parties' communications and acts. *Kabil Developments Corp. v. Mignot,* 279 Or 151, 156, 566 P2d 505 (1977); *Harty v. Bye,* 258 Or 398, 403, 483 P2d 458 (1971). In *Kitzke v. Turnidge,* 209 Or 563, 573, 307 P2d 522 (1957), the Supreme Court stated:

"The law of contracts is not concerned with the parties' undisclosed intents and ideas. It gives heed only to their communications and overt acts.

"Williston on Contracts, § 22A, says: 'Though assent must be manifested in order to be legally effective, it need not be expressed in words. In the early law of assumpsit stress was laid on the necessity of a promise in terms, but the modern law rightly construes both acts and words as having the meaning which a reasonable person present would put upon them in

view of the surrounding circumstances. Even where words are used, "a contract includes not only what the parties said, but also what is necessarily to be implied from what they said." And it may be said broadly that any conduct of one party, from which the other may reasonably draw the inference of a promise, is effective in law as such."'

A determination whether a contract was formed here is a question of law for the court. *Quillin v. Peloquin,* 237 Or 343, 391 P2d 603 (1964).

██ ██    The first question is whether Holmes' letter contained an offer from RELF. Whether a communication contains an offer is determined by what a reasonable person in the receiver's position would have been led to believe upon its receipt. *See Southworth v. Oliver,* 284 Or 361, 369, 587 P2d 994 (1978). Holmes letter detailed RELF's position and set out the reason for the proposal. We conclude that a reasonable person in the Association's position would have construed Holmes' letter to contain an offer from RELF.

██    The second question is whether the Association accepted RELF's offer. "A manifestation of acceptance to the offeror or his agent forms the contract regardless of the intent of the acceptor." *Restatement of Contracts* §20. *See Sheedy v. Stall,* 255 Or 594, 600, 468 P2d 529, *rev den* (1970); *see also Fogdall v. Lewis & Clark,* 38 Or App 541, 548, 590 P2d 775 (1979). Brenneman's letter to Holmes manifested acceptance of RELF's offer. No contrary intent was expressed. We hold that, if Brenneman had authority to accept RELF's offer, Brenneman's letter constituted an acceptance.

The Association contends that RELF knew that the Association acts through its Board of Directors and that Board action was required, that the Board never gave authority to accept the contract and, thus, that no binding contract was formed. RELF contends that the Association is estopped to deny Brenneman's authority to accept the offer and, thus, to form a binding contract, because RELF reasonably and detrimentally relied on Brenneman's apparent authority to convey the Board's acceptance of RELF's proposal.

Oregon recognizes the principle of agency by estoppel.

" "* * * Stating the rule as one of estoppel, where a

principal has, by his voluntary act, placed an agent in such a situation that a person of ordinary prudence conversant with business usages and the nature of the particular business is justified in assuming that such agent has authority to perform a particular act and deals with the agent upon that assumption, the principal is estopped as against such third person from denying the agent's authority; he will not be permitted to prove that the agent's authority was, in fact, less extensive than that with which he apparently was clothed. This rule is based upon the principle that where one of two innocent parties must suffer from the wrongful act of another, the loss should fall upon the one who, by his conduct, created the circumstances which enabled the third party to perpetrate the wrong and cause the loss.' 2 Am Jur, Agency, § 104." *Andrews v. Spencer, Executrix,* 193 Or 615, 621-22, 238 P2d 729 (1951), *reh'g den* (1952).[4]

Other Oregon cases have recognized the connection between "apparent authority" and "estoppel".

"At the outset, we note that a general statement of the elements necessary to application of the doctrine of apparent authority as quoted from *Jones v. Nunley, supra,* does not include all of the usually stated elements of equitable estoppel, particularly with regard to the requirement of change of position; nevertheless, both doctrines are employed to prevent one from proving an important fact to be something other than what by act or omission he has led another party justifiably to believe. Both doctrines rest upon principles of good faith and honesty and the notion that one should not be able to take advantage of the falsity of what he has led another to believe to be true. There is really no practical difference between application of one doctrine or another to hold a principal liable for the promise of the agent.

" 'Although there are certain well-defined distinctions between apparent authority and estoppel, courts, in the great majority of decisions, rest the liability of the principal for transactions of the agent falling within the ambit of apparent authority on the doctrine of estoppel. [Footnotes omitted]

" '* * * * *

" 'In regard to this distinction it may be observed that apparent authority, like estoppel, is generally applied by

---

[4] *See also Williston on Contracts,* § 277 B (3rd ed, Jaeger 1959); Friedman, *The Law of Agency,* 65-66 (1976).

the courts to bind the principal in which case the elements of apparent authority and estoppel, in this respect, as well as the results achieved, are the same.' (Footnotes omitted)

"2 Williston on Contracts § 277B (3rd ed., Jaeger 1959)." *Wiggins v. Barrett & Associates, Inc.,* 295 Or 679, 689, 669 P2d 1132 (1983).

In *Wiggins,* the court noted that both principles would yield the same result.[5] The defendant corporation's secretary had directed the plaintiffs to contact certain persons as the corporation's representative on the actions in question. The plaintiffs relied, to their detriment, on the representative's promise. The Court held that the representative had apparent authority and that the corporation was estopped to deny its representative's authority. 295 Or at 688-89. In this case, either principle will also yield the same result.

Authority of an agent to bind a corporation may arise from the course of dealings between the agent and a third party and the manner in which the agent has been permitted by the board of directors to transact business. *Carstens Packing Co. v. Gross,* 131 Or 580, 584, 293 P 20 (1930); *Sherman-Clay Co. v. Buffum & Pendleton,* 91 Or 352, 358, 179 P 241 (1919). In addition, formal board action is not always required for the formation of a valid contract between a corporation (or association) and a third party. *Sherman-Clay Co. v. Buffum & Pendleton, supra,* 91 Or at 358.

---

[5] The Supreme Court noted the difference between the two principles:

" 'A most important exchange of terminology sometimes occurs in ordinary usage, converting the term 'apparent authority' into 'estoppel' or using the two as alternatives. Yet technically, there is a difference between the two. As described in the *[Restatement (Second) of Agency* § 8, comment d], the apparent authority doctrines are based upon the contractual premise that one should be bound by what he says and what people hear rather than what he may intend, if that differs. Estoppel, used here in the limited sense of estoppel in pais or equitable estoppel, is directed at the prevention of loss to innocent persons. Its enforcement depends not only upon manifestation to third persons, and in their reasonable reliance thereon, but also upon their change of position such that it would be unjust for the principal to go back on his manifestation. Also, apparent authority theories permit the principal to sue the third party, whereas estoppel is not thought to convey contract rights to the principal capable of affirmative assertion. Despite the technical differences, "apparent authority" and "estoppel" are often found in a case side by side, so that liability of a principal can be based on either or both principles.' (Footnotes omitted.) Whelan, *Government Contract: Apparent Authority and Estoppel,* 55 Georgetown Law J. 830, 832 (1967)." *Wiggins v. Barrett & Associates, Inc., supra,* 295 Or at 689 n 3.

Brenneman was RELF"s only contact with the Association during these dealings. The only communications between the parties took place with Brenneman. He had been in contact with MBC regarding how assessments were made and allocated per unit and provided explanations regarding liens filed on unpaid assessments. These activities indicated to MBC and to RELF that Brenneman represented the Association in these matters and had authority to deal with them on behalf of the Association. The Association never indicated anything to the contrary.[6] Brenneman's letter of March 2, 1982, was a continuation of those prior dealings. In addition, the Board approved the minutes of the February 27 unit owners meeting at its next meeting on March 13. A reasonable person could view that as an approval of the actions taken by the unit owners, including the "decision made to comply with [RELF's] request."[7] The Board did not take steps to indicate that Brenneman had no authority, even after it received the release documents from RELF.

■■■ Oregon follows the rule that "[p]ersons dealing with a known agent have a right to assume, in the absence of information to the contrary, that the agency is general." *Start v. Shell Oil Co. and Anderson,* 202 Or 99, 107, 260 P2d 468, 273 P2d 225 (1954); *Rae v. Heilig Theatre Co.,* 84 Or 408, 413, 185 P 909 (1919). However, a third party has no right to rely on the "apparent" authority of an agent if he knows that the agent has no actual authority or is aware of facts that should put the third party on inquiry. *Portland v. American Surety Co.* 79 Or 38, 43-44, 153 P 786, 154 P 121 (1916). The Association contends that RELF knew that Brenneman had no authority because the Association approved Bayshore's prospectus and had received the by-laws, both of which stated that management of the Association was solely by the Board. Thus, the

---

[6] The minutes of the unit owners meeting indicate that the letter was circulated. All Board members were present at that meeting. The letter was addressed to Brenneman. The Board knew, or reasonably should have known, that RELF was relying on Brenneman's authority at that time. The Board never indicated that Brenneman lacked authority.

[7] At trial, Vandehey, the Association's vice president, contended that approval of the unit owners minutes was a typographical error; that it should be approval of the Board's minutes. However, the approval is coupled with a note that the minutes should be amended to add Mr. Steveley's name to the list of members of the *ad hoc* committee to investigate the time share program. That committee was formed during the unit owners meeting, not the Board's meeting.

Association contends that RELF had no right to rely. However, RELF took steps to comply with the need to obtain Board approval and indeed thought that it had obtained Board approval. RELF sent the proposal to Brenneman, asking that it be presented to the Board. Brenneman responded three days after the Board meeting with a letter on Association stationery stating that the Board had agreed to accept the proposal. Thus, RELF had reason to believe that the proposal had been properly presented to the Board, that the Board had accepted it and that Brenneman was acting under the Board's authority in conveying its acceptance.

In *Minniti v. Cascade Employers Assn.*, 280 Or 319, 330, 570 P2d 1171 (1971), the court stated that the only way a third party can overcome an admission that it knew that board authorization was required was by evidence that the agent had communicated board acceptance, rather than his own, at which point the third party would again be entitled to rely on the apparent authority of the agent. Here, by his letter, Brenneman indicated the Board's acceptance. Thus, MBC and RELF were entitled to rely on Brenneman's apparent authority to bind the Board and the Association on a matter in which RELF had had prior dealings with Brenneman.

As explained by the Supreme Court, *see* note 5, *supra,* estoppel requires proof of the additional element that the third party "change [its] position such that it would be unjust for the principal to go back on his manifestation." *Wiggins v. Barrett & Associates, Inc., supra,* 295 Or at 689 n 3. We conclude that RELF changed its position by halting the foreclosure and collection proceedings and by having some cases dismissed for want of prosection. It would be unjust for the Association to deny Brenneman's authority after such a change in position. On the basis of the conduct of the Association and its Board, the Association is estopped to deny that it accepted the contract.

Reversed and remanded.